THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL LEWIS, a/k/a Mike O'Flynn (Impleaded) *et al.*, Defendants-Appellants.

(Nos. 55656, 55673 cons.;

First District—May 30, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Lee T. Hettinger and James J. Doherty, Assistant Public Defenders, of counsel,) for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Themis N. Karnezis, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

The defendants, Michael Lewis and Robert Lee Brown, were indicted with one Benjamin Branch (See *People v. Branch,* 6 Ill.App.3d 107, filed May 30, 1972) for armed robbery, a violation of Ill. Rev. Stat. 1969, ch. 38, par. 18—2. Following a jury trial, defendants were found guilty as charged and were each sentenced to a term of years in the Illinois State Penitentiary.

On appeal, defendants present three contentions:

(1) That they were denied their fundamental right to cross-examine the witnesses against them;

(2) That they were denied a fair trial and due process of law when the prosecution introduced before the jury certain evidence of narcotics violations and addiction which was unrelated to the offense for which they were being tried;

(3) That they were not proven guilty beyond a reasonable doubt.

The evidence adduced upon the trial disclosed that on February 27, 1970, at approximately 6:00 A.M., Wilbur Miller, the complaining witness, was walking west on Lake Street toward Austin Boulevard, in Chicago. As Miller reached 5700 West Lake Street (about three blocks east of Austin Boulevard), Defendant Lewis approached from behind and announced, "This is a stickup." Lewis then held a gun in Miller's face and directed him into a gangway between two nearby buildings. Lewis was joined at this time by Defendant Brown and Benjamin Branch. After the four men entered the gangway, according to Miller:

"They started fumbling around with my overcoat and trying to get it unbuttoned and I got nervous because the gun was shaking in front of my face so I unbuttoned it myself, I don't know who grabbed the wallet * * *. I asked them to leave the wallet and they threw it on the ground, they took out my money [$6.00] and threw the wallet down * * *. They told me to lie down on the ground * * *. Lewis said he would kill me if I didn't * * *. I did what he told me * * *. They ran away [east on Lake Street]."

Miller lay on the ground for about two minutes and then, after retrieving his wallet, ran to a nearby restaurant, phoned the police and reported the incident. A short time later, a police officer arrived at the restaurant and informed Miller that three suspects had been arrested. Miller accompanied the officer to the corner of Madison Street and Lotus Avenue, about seven blocks away, and identified the three men being held there by the police. Approximately fifteen minutes elapsed between the time of the robbery and the time of the identification.

As indicated above, defendants have advanced three contentions for consideration by this court. In our view, however, we need consider only the second contention because our careful review of the record reveals it to be a meritorious one. In essence, defendants contend that they were unfairly treated at trial because highly inflammatory, prejudicial and immaterial evidence of narcotics violations was put before the jury. The record supports defendants' contention.

During opening argument, the prosecutor made the following comment:

"\* \* \* Meanwhile, of course, the three defendants had been searched, two of the defendants had nothing of consequence on them, on the person of the third there was found $6, a five dollar bill and a one dollar bill which was the denominations taken from the wallet of Mr. Miller and he'll so testify. *Also taken from the person of one of the defendants was two narcotic needles. \* \* \**" (Emphasis added).

Again during opening argument, the prosecutor referred to the hypodermic needles, saying, "So they [police] had found the money in the same denominations and *they had found the needles* and they found the gun fifty feet from the person of the three defendants \* \* \*." (Emphasis added). In the course of the prosecution's direct examination of a police officer, the following colloquy occurred:

"Q. All right. Did you have occasion to search the defendant Brown? A. Yes, I did.

Q. And what if anything did you find on the defendant Brown?

DEFENSE: Object to this and ask to be heard \* \* \* [Outside the hearing of the jury] This will bring into question \* \* \* if the answer from this officer is going to be what I think it is going to be it is going to involve a hypodermic needle and would prejudice the jury. It is of another crime.

THE COURT: Overruled.

Q. [In the presence of the jury] May the court reported read my last question back?

[The question was repeated]

DEFENSE: I will object to that question.

THE COURT: Objection overruled. Proceed.

A. Yes, I did.

Q. And what did you find?

THE COURT: Let the record show all counsel are objecting and it is overruled. Proceed.

A. In his right rear pocket I found two hypodermic needles.

DEFENSE: Motion for a mistrial  *  *  *.

THE COURT: Motion denied. Proceed.

[Two hypodermic needles were marked for identification as prosecution exhibits]

Q. Now officer, I show you  *  *  *  two hypodermic needles and I ask you to examine that if you will, sir.

[The needles were examined by the officer]

Q. Are you able to identify them?

A. Yes, I am.

Q. Will you do so?

A. They appear to be the same two needles that were taken from Mr. Brown."

*  *  *

A similar exchange occurred during the prosecution's redirect examination of the same police officer:

"Q. Now, Officer, you were shown what has been marked as People's Exhibit number 4, for identification, which you have described as two hypodermic needles, is that right.

A. Yes.

Q. Have you ever seen any hypodermic needles before?

A. Oh, yes.

Q. On how many occasions, sir?

A. Many. We spend a lot of time in hospitals on injuries.

Q. On how many occasions have you recovered them from persons on the street?

DEFENSE: Object.

THE COURT: Overruled.

A. Three or four different times.

Q. Now, Officer, based on your experience, what is a hypodermic needle used for when it is recovered from a person on the street?

DEFENSE: Object.

THE COURT: Objection sustained."

*  *  *

The prosecution later sought to have the hypodermic needles intro-

duced into evidence under theories that the needles were "part of the *res gestae*" and that they tended to show motive. The court, however, after conducting a hearing in chambers, refused to accept them into evidence. The prosecution again moved to admit the needles into evidence, this time in the presence of the jury, and the court again denied the motion.

During the opening argument of his summation, the prosecutor stated, "Now, on Mr. Brown there was found two hypodermic needles," and during his closing argument, he again referred to the needles, saying:

"* * * Here is my thought on those hypodermic needles, ladies and gentlemen, they were taken off Brown when he was arrested. It is true they were not admitted into evidence, that is true, but I think that is important in this case for this reason—We all know what hypodermic needles are used for and we all know that frequently there are motives for committing crimes, now, there is a motive suggested here, in my opinion, with those hypodermic needles because we know what they are used for and we know that people who use them need large amounts of money * * *."

One more reference to the needles was made before the prosecutor concluded his argument: "* * * the other fellow had hypodermic needles, they were young men and they were male Negroes, that is part of the circumstantial evidence, that is all part of the case."

We have quoted at length from the record in this case to illustrate the extent to which the collateral evidence of narcotics use or violations was put before the jury by the prosecution. The State argues that the evidence had some relevance and contends, therefore, that no unfairness to defendants resulted from its continued use. We agree, certainly, that the evidence might have had some probative value, but we are also mindful that the evidence was not material in this case and, indeed, was highly inflammatory and prejudicial. This was a trial for armed robbery only and the elements necessary for the prosecution to prove in such a cause are well defined by statute. Those elements include no reference to narcotics. We, of course, cannot know the purposes for which the prosecution emphasized the collateral evidence during the trial. We assume that the prosecutor was merely overzealous in his desire to see justice done. But, whatever the reason, we are of the opinion that the collateral evidence was employed to such a high degree that defendants' rights were substantially infringed. As stated in *People v. Novak*, 1965, 63 Ill.App.2d 433, 442: "It needs no extended discussion to demonstrate that the use of narcotics is regarded by the major part of society with aversion and contempt, and that the references to the

matter undoubtedly prejudiced the defendant in the eyes of the jury." See also, *People v. Smith* 1967, 38 Ill.2d 237; *People v. Battle* 1963, 24 Ill.2d 592.

Convinced, therefore, that the improper evidence may well have affected the jury's verdict, we reverse the judgment of the trial court and remand the cause for a new trial.

Reversed and remanded.

GOLDBERG, P. J., and BURKE, J., concur.