Harry Rex **CHRISTIAN**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. 1626.

Supreme Court of Alaska.

Aug. 31, 1973.

---

William H. Fuld, Kay, Miller, Libbey, Kelly, Christie & Fuld, Anchorage, for appellant.

Daniel W. Hickey, Asst. Atty. Gen., Juneau, Stephen Dunning, Asst. Dist. Atty., Seaborn J. Buckalew, Jr., Dist. Atty., Anchorage, John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

CONNOR, Justice.

Appellant was convicted, after jury trial, of the offense of knowingly making a fraudulent application for a motor vehicle title certificate in violation of AS 28.10.-600.[1] In this appeal he asserts that (1) the indictment is defective, (2) certain evidence used at trial was the result of an unlawful search and seizure, and (3) the sentence imposed was excessive.

Appellant was indicted on June 3, 1971. Count I of the indictment, on which the conviction was obtained, reads as follows:

"That on or about the 19th day of May, 1970, at or near Anchorage, in the Third Judicial District, State of Alaska, Harry Rex Christian did knowingly make false statements, conceal material facts or otherwise commit fraud in application for registration of a vehicle in procuring State of Alaska certification of title no. 35990."

Before trial appellant moved to dismiss the indictment for failure to state an offense with sufficient particularity. He also moved for a bill of particulars asking for the time and place of the fraudulent statements alleged in the indictment, the person to whom those statements were made, the particular writings containing those statements, and a list of each false statement and each material fact.

The superior court denied the motion to dismiss the indictment but granted the bill of particulars. The state filed a bill of particulars and attached certain bills of sale for truck parts which appellant had claimed he purchased, and an affidavit by appellant that he had rebuilt the truck from various parts and pieces. Appellant still objected to the lack of specificity of the indictment.

Evidence adduced by the prosecution in this case shows that in the early spring of 1971, the state, through Trooper Edward Harter, began a physical examination of the vehicle which was the subject of Count I of the indictment, a green and white, three-quarter ton pickup truck. Trooper Harter commenced the investigation contacting David Faulk, who at the time was the registered owner and had title free of any liens. Appellant had sold the truck to Faulk after obtaining a certificate of title by representing to the state that he rebuilt the vehicle. Since Harter could not complete the examination without the proper equipment, he asked that Faulk bring the vehicle to his office for further examination. Faulk did so. Harter later called him and requested time to make further tests. Faulk told Harter that the state troopers could have the vehicle "forever".

Subsequently, Christian claimed that the truck belonged to him: that Faulk had defaulted on payments, and had returned the title documents to Christian. On May 18, 1971, before he had been indicted, appellant by letter requested the return of the truck from the state troopers. The troopers refused by a letter dated June 14, 1971, which was written after the indictment had been returned. Appellant formally moved for the return of his property on June 17, 1971, stating that continued holding of the truck was illegal and constituted a seizure.

At the hearing on the motion, July 1, 1971, the state gave two reasons for not returning the vehicle: (1) it feared destruction of the evidence if it were to be returned to appellant, and (2) it was investigating another possible crime with respect to this vehicle, namely, theft. Appellant claimed both legal and equitable ownership, although he had not filed the appropriate mo-

1. AS 28.10.600 provides as follows:
"A person who fraudulently uses a false or fictitious name in an application for the registration of a vehicle or a certificate of title, or knowingly makes a false statement or knowingly conceals a material fact or otherwise commits a fraud in an application for registration is guilty of a felony, and upon conviction is punishable by imprisonment for not less than one year nor more than two years, or by a fine of not more than $2,000, or by both."

tor vehicle forms for transfer of title to himself. Appellant did not offer proof of ownership or testimony at that time. The state brought forth one witness, Trooper Harter, who testified that the Director of the Division of Motor Vehicles had recalled the title and registration on this truck and that an investigator from the Department of Revenue had attempted to seize the title and registration certificates from Faulk, who said he no longer had the title papers and had given them to Christian. The trial judge did not determine whether Christian had ownership rights. He denied the motion for return of the property.

Much of the evidence presented by the state at trial was derived from searches of the truck conducted in October of 1971 after Christian's claimed resumption of ownership. These searches disclosed information to disprove appellant's claim that he had rebuilt the truck from bits and pieces. Examinations of the truck indicated that it had factory paint job, the frame had been altered with a fake welding job, and all factory serial numbers had been expertly removed.

The remainder of the state's evidence consisted of bills of sale (some written out on scraps of paper), and affidavits signed by Christian in applying for registration, testimony from two clerks who processed the papers, testimony from the Director of the Department of Motor Vehicles, and testimony from two alleged vendors of parts who denied selling the parts in question to Christian.

Although Faulk admitted on cross-examination that he surrendered the title certificate to Christian in lieu of making further payments on the truck, Faulk did not indicate that he intended thereby to return the truck to Christian. Furthermore, no evidence was adduced at trial that Faulk had signed the title certificate over to Christian or that Christian subsequently registered the truck in his own name.

I

█ Appellant asserts that the indictment was fatally defective because it charged the commission of the offense in the disjunctive form, thus failing to give appellant a specific and explicit statement of the case he should have been prepared to meet. The state argues that the indictment charged only one crime, committed by alternative methods, that appellant was not misled as to the nature of the charge, and that the indictment was sufficiently specific to enable appellant to plea a judgment in bar of any future prosecution for the same offense.

█ Under the tests adopted in Adkins v. State, 389 P.2d 915 (Alaska 1964), and Drahosh v. State, 442 P.2d 44 (Alaska 1968), the state urges that the indictment should be sustained. We agree that under modern principles of criminal procedure an indictment should not be construed hypertechnically in an effort to find fatal flaws when, by a reasonable approach, it can be read as fulfilling the basic criteria of sufficiency. Here the indictment named the defendant, gave the date and place of the offense, stated the essential elements of the offense, cited the precise number of the certificate of title, and named several methods by which the offense was perpetrated. This gives fair notice of the offense charged. Under the facts of this case we do not believe that the formal indictment would present any genuine obstacle to making an effective plea in bar in the event of future prosecution for the same offense. Under Price v. State, 437 P.2d 330, 331–332 (Alaska 1968), "The whole record of a former trial may be examined in order to determine whether a plea of former jeopardy may be made." The evidence produced in the case at bar was sufficiently specific to protect against a double prosecution violative of the double jeopardy prohibitions of our constitution.

█ If these were the only problems presented in this appeal we would summarily affirm the conviction as to this claim of error. But we are presented with an additional question, merely alluded to by appellant, which requires consideration.

Although the indictment, standing alone, is not fatally defective, the combination of the indictment and the instructions to the jury may present the question of whether the jury intelligibly rendered the unanimous verdict. *See* Drahosh v. State, 442 P.2d 44 (Alaska 1968) and People v. Scofield, 203 Cal. 703, 265 P. 914 (1928). In its Instruction No. 9 to the jury, the trial court stated that in order to find appellant guilty it was necessary for the prosecution to prove:

"As to each count that on or about the day alleged, at or near Anchorage, Harry Rex Christian did knowingly and willfully make false statements, or false representations and knowingly and willfully concealed material facts."

Under this instruction, in order to find appellant guilty, the jury would have had to find that appellant not only made false statements but also concealed material facts as a means of perpetrating the fraud.[2] We do not, therefore, find that the indictment and instructions, in combination, inflicted any prejudice on appellant. We reject appellant's claim of error and hold that in the context of this case the indictment was not defective.

## II

In support of his claim that there was an unlawful search and seizure of the vehicle, appellant argues that Faulk only had "temporary possession" of the vehicle at the time the state troopers picked it up, that appellant was the legal owner, and that Faulk was only a "permittee of the owner". It is urged that because the police failed to obtain permission from the true owner of the vehicle the searches were unlawful. Additionally, appellant argues that even if the first searches were lawful, the second series of searches, conducted after appellant reclaimed the vehicle, were unlawful because Faulk's consent was insufficient to cover those searches and there was a failure by the police either to get a

search warrant or to obtain appellant's consent to the searches.

We will assume, without deciding, that appellant has standing to object to the search of the vehicle.

■■ It is true that where a third party, here Mr. Faulk, consents to a search or seizure, the validity of that consent depends upon physical possession or ownership of the property. In order to object to the consent to search the truck, appellant must show either ownership, possession, or rights to possession of the property. Since he did not demonstrate that he had completed actual or intended transfer of the truck to himself, or that he had possession, either constructive or actual, we think that appellant's claim must fail. We find nothing in the record which negates Faulk's ability as the registered owner of the vehicle to give a valid consent to the search.

The alleged transfer from Faulk to Christian, i. e., handing over of the title papers, was incomplete and, therefore, invalid. Our statutes require the issuance of a new certificate of registration and a certificate of ownership before the transfer of title to a motor vehicle is complete. AS 28.10.370 provides in part:

"Until the department issues a new certificate of registration and certification of ownership, delivery of a vehicle required to be registered under this chapter shall be deemed not to have been made and title shall be deemed not to have been passed, and the intended transfer shall be deemed incomplete and not valid or effective for any purpose."

The state troopers had a right to rely upon the records of the Division of Motor Vehicles to determine that Faulk had the requisite ownership to consent to a search. AS 28.10.560 provides:

"In a civil or criminal proceeding when the title or right to possession of a vehicle is involved, the record on registrations and certificates of title as they appear in the files and records of the de-

---

2. We regard the words "false representations" as synonymous with "false statement."

partment are prima facie evidence of ownership or right to possession of the vehicle."

Appellant asserts that Faulk still owed him money for the purchase of the truck, and that he never really abandoned possession of the vehicle. However, any private agreement between appellant and Faulk would be of no consequence in determining who could consent to a search, as none of the formalities which are required to vest a right of ownership or possession were complied with by appellant.

Because appellant failed to establish either ownership or a possessory interest in the vehicle, he had no valid ground for objecting to the various police searches of the vehicle. We find no error.

### III

Appellant was sentenced to two years imprisonment, with eligibility for parole after serving one-third of the sentence, and a fine of $1,000 to be paid within one year after his release. This is virtually the maximum sentence for this offense.[3]

This was appellant's first conviction for making a fraudulent motor application. His only previous criminal conviction was for reckless driving.

At the time of his sentencing appellant was twenty-seven years old, was married and had one child living in the home. He had held a variety of jobs but was then employed as a fireman with the Greater Anchorage Area Borough Fire Department. He had good references from his employment supervisor and from others who urged that he be placed on probation. The presentence report also contains a statement by appellant in which he attempts to explain the facts of the case and reassert his innocence. Upon reading appellant's entire statement, however, one can glean certain tacit admissions which indicate his awareness of having gotten himself into trouble with the law through his voluntary actions.

After evaluating the circumstances of the case, and basing his conclusion in part on appellant's refusal to admit guilt, the probation officer recommended imposition of a two-year sentence, with probation denied.[4]

The trial judge received the presentence report and read it during the sentencing hearing. Probably he considered it to some extent in his imposition of sentence. The trial judge, however, specifically stated that he would not "penalize the defendant for not admitting anything."

Nevertheless, the court imposed a sentence of two years imprisonment and a fine of $1,000. In imposing the sentence the court seemed to be concerned that appellant was unwilling to admit criminal responsibility, and stated that punishment was the main aim to be achieved.[5] There

---

3. The maximum sentence would be two years imprisonment and a fine of $2,000. AS 28.10.600.

4. The probation officer's report concludes: "Because of the defendant's career type employment, his family responsibilities, his lack of criminal history, his possible poor health, and the family tragedy of his missing brother, consideration has been given to recommending to the Court that the defendant be granted probation; however, the defendant's attitude, that he is a completely innocent man being harassed and defamed, etc. would indicate that he is not amenable to probation supervision. This man has attempted, through a series of fraudulent and deceptive acts, to effect the registration and sale of an apparently stolen vehicle. If the defendant would accept the responsibility for his criminal acts, pro-

bation supervision might contribute to his rehabilitation. However, in rejecting this responsibility and his personal guilt in the face of the evidence against him, the defendant is demonstrating that he would derive little value from probation superversion."

5. At the sentencing hearing the trial judge stated:
"The evidence was very strong and very good and the testimony was, in my opinion, more than sufficient to prove the allegation here and I'm not—I don't get the full—the report doesn't give me enough of Mr. Christian's background and everything else because I'm sure that there's a lot of things that aren't here that are true and hidden and—because of the way things have occurred. I'm not going to let him get away with just saying I'm sorry, that's

seems to be no question that appellant did not represent a general or particular danger to the community, in light of his having been detected and convicted of this offense. The presentence report does not deal directly with the question of appellant's rehabilitation potential, other than to express the belief that he would not respond to probationary supervision in view of his persistence in claiming innocence of the offense.

■ The problem presented in this sentence appeal does not yield an easy solution. It is our policy to give considerable leeway to the discretion of the sentencing judge. State v. Chaney, 477 P.2d 441 (Alaska 1970). On the other hand, for appellate review to be effective, we must ourselves weigh the factors which properly enter into the determination of the sentence. Only in this manner can we be assured that the limits of sound discretion have been observed.

■ Certainly the offender's unwillingness to accept criminal responsibility can and should be taken into account by the sentencing court. But it should be only one of several factors to be weighed in the scale of justice. Even one who unreasonably maintains his innocence may be susceptible of rehabilitation by a means short of a maximum sentence.[6] Although he may be psychologically or emotionally unable to concede his guilt completely, it may still be possible to bring about a reformation of his conduct in the future through probation. The very fact that he is on probationary status, and that incarceration is an ever present potentiality, may be enough to make a critical difference.

■ We believe that in imposing sentence here too much emphasis was placed on punishment, and not enough attention was given to appellant's rehabilitation potential. Certainly some imprisonment might properly be ordered, just as a grant of complete probation would be within the trial court's discretion. But we do not find circumstances in this case which call for imposing the virtual maximum sentence. The legitimate concern with expressing community condemnation of wrongful conduct should not have outweighed other sentencing factors [7] so com-

definite because I don't think people can just say, I'm sorry, and just walk away and think that, well, that's it. I think I'm—I follow what our Supreme Court has said in State versus Chaney, there's got to be some punishment and rehabilitation isn't the only thing and I think Mr. Christian has got to be punished and I'm going to sentence him accordingly. I—it is his first offense. I'm going to sentence him to 2 years at—recommended by the probation department and rather than let him serve the entire 2 years I'm going to recommend that he serve one-third of it and then be eligible for probation. I'm going to also fine him A Thousand Dollars ($1,000.00). I think this was a very expensive case for the state which caused by Mr. Christian. I think he can be given a period of a year after his release to pay the Thousand Dollars ($1,-000.00). It's—as I say it's a first offense and perhaps there's some problems that arise because of this sentence, but I think these are problems that were caused by Mr. Christian. I'm not convinced that in—I don't necessarily agree with Mr. Davis that he should have admitted his guilt, but in reading his statement as to why he—what occurred, I feel that he's got a lot of insight to do and stop trying to con people and realize that perhaps he's got to accept responsibility and as of oh, about a week ago he didn't accept responsibility when he wr— when he was talking to Mr. Davis. This is obvious. The state may have caused him to do something wrong, which I can't buy."

6. We note in passing that it may be unreasonable to expect an offender to admit guilt when his case is on appeal. In such circumstances we think the denial of guilt should not be considered as a factor weighing against probation.

7. As we observed in State v. Chaney, 477 P.2d 441, 444 (Alaska 1970):

"Under Alaska's Constitution [art. I, § 12], the principles of reformation and necessity of protecting the public constitute the touchstones of penal administration. Multiple goals are encompassed within these broad constitutional standards. Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during

pletely as to require the sentence which was here imposed.

We have decided to reverse the sentence and remand the case to the superior court for further consideration of appellant's possible rehabilitation through either a shorter sentence or probation, or a combination thereof, and for the imposition of a new sentence.[8]

Conviction affirmed. Sentence reversed and remanded.

ERWIN, Justice (concurring).

I agree with the discussion of all issues herein and the remand for further consideration in sentencing but would leave to the discretion of the trial judge the extent of any new sentencing hearing.

The focus of the state's argument for the maximum sentence was that the job was so expertly done that the appellant must be a professional criminal—the worst class of offender. While there is some testimony as to the expertness in the removal of identifying numbers, etc., and the reconstruction of one automobile from several such parts, there simply is no other evidence to support the view that appellant is a professional criminal and thus is in the worst class of criminal offenders. I would therefore vacate the sentence of the trial court for this reason but on remand would permit the state and the appellant to introduce evidence on such an issue if they so desired.

the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves." (Footnote omitted.)

8. On remand, the court should consider the standards relating to sentencing alternatives articulated by the American Bar Association Project on Minimum Standards for Criminal Justice. We find several of the individual standards worthy of particular note:
Standard 2.2 specifies:
The sentence imposed in each case should call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant.
Subsection (d) specifies:
A sentence not involving confinement is to be preferred to a sentence involving partial or total confinement in the absence of affirmative reasons to the contrary.

Section 2.4 refers to partial confinement alternatives, and subsection (c) thereof states:
A sentence involving partial confinement is to be preferred to a sentence of total confinement in the absence of affirmative reasons to the contrary.
And Section 2.5(c) specifies:
A sentence not involving total confinement is to be preferred in the absence of affirmative reasons to the contrary. Examples of legitimate reasons for the selection of total confinement in a given case are:
(i) Confinement is necessary in order to protect the public from further criminal activity by the defendant; or
(ii) The defendant is in need of correctional treatment which can most effectively be provided if he is placed in total confinement; or
(iii) It would unduly depreciate the seriousness of the offense to impose a sentence other than total confinement.
On the other hand, community hostility to the defendant is not a legitimate basis for imposing a sentence of total confinement.
American Bar Association Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures (Approved Draft 1968).