Thomas B. NEWSOM, Appellant,

v.

STATE of Alaska, Appellee.

No. 2189.

Supreme Court of Alaska.

April 3, 1975.

Herbert D. Soll, Public Defender, Lawrence J. Kulik, Asst. Public Defender, Anchorage, for appellant.

Avrum M. Gross, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., Stephen G. Dunning, Asst. Dist. Atty., Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and FITZGERALD, JJ., and DIMOND, Justice Pro Tem.

## OPINION

DIMOND, Justice Pro Tem.

Newsom was convicted of rape. ·On this appeal he raises the following points: (1) that the grand jury indictment was invalid because based on insufficient evidence; (2) that it was prejudicial error for the

trial court to allow the admission into evidence of the contents of a laundry bag Newsom had in his possession at the time of the alleged rape; and (3) that the sentence of imprisonment of 15 years imposed by the court was excessive.

*The Grand Jury Indictment.*

Three witnesses appeared before the grand jury. Embry, a Loomis Security Guard, making his rounds late one night, saw a woman, obviously intoxicated, walking in the vicinity of the Anchorage Cemetery. He also noticed that a man appeared to be following her, and becoming suspicious, he notified Police Officer Gonzales of this fact.

Gonzales came to the scene and turned on the floodlights of his police vehicle. Both he and Embry observed a man, who turned out to be Newsom, lying on top of a woman. The woman was unclothed below the waist, and Newsom's trousers were pulled down below his knees. Gonzales stated that he told Newsom to get off the woman and that the latter then "disengaged his member from her." When asked whether Newsom was penetrating the woman at the time, Gonzales: "Well, the way he stood up, he got up on his knees, I could tell that he had penetration." In addition, Gonzales said that the female victim told him that Newsom had raped her and told her if she didn't do what he wanted he would kill her.

The last witness was the female victim. She testified that Newsom had been following her and when he caught up with her he put his arms around her neck and took her into the cemetery, that he threatened to choke her if she didn't do what he wanted, that he took her clothes off, that she was too weak to fight, that he threw her to the ground, and that he had his hands around her neck and was on top of her.

At first the victim was reluctant to testify that Newsom had raped her. At one point she said that she didn't think "that he did it." Later, under examination by the state's attorney, she said that she didn't re-

member whether he did it or not. And then finally the following discourse took place, near the end of the Grand Jury proceeding, between the state's attorney and the victim:

Q. That is, did he complete the rape? If you so remember, I want you to tell us but if you don't remember, tell us you don't remember. Tell us why you don't remember, O.K.? Can you do that now? O.K., what do you remember about that?

A. He did rape me.

Q. Do you know that he penetrated you?

A. Um-hum.

Q. And why is it that you didn't want to tell me about it?

A. Because I—I don't like to tell everybody that.

Q. I see.

A. All these people watching me.

Q. Um-hum.

A. They're all looking at me.

Q. I can understand that.

When asked why she did not want to tell about it she said: "Because I don't like to tell everybody that—all these people watching me—they're all looking at me." Obviously, she was embarrassed and humiliated at having been raped, and this would adequately explain her initial reluctance to testify as to what actually happened.

■ Where there is a challenge to the sufficiency of the evidence supporting the Grand Jury indictment, the question to be determined

. . . is whether the evidence presented a sufficiently detailed account of criminal activity and the defendant's participation in this activity so that "if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by the judge or jury trying the offense."[1]

■ The rule is satisfied in this case. AS 11.15.120 provides that "a person who . . . has carnal knowledge of a female person, forcibly and against her will, . . . is guilty of rape." The female victim in this case said at first she did not think that Newsom had raped her, then said she was not sure whether he had or not, and finally ended up upon further examination by stating that she had been raped by Newsom. But she explained this apparent contradiction because of her understandable embarrassment at having to admit before the people comprising the Grand Jury that she had been raped. Her testimony, supported by Officer Gonzales' testimony, if unexplained or uncontradicted by other evidence, would warrant a conviction of Newsom of the crime of rape. It was therefore sufficient to support the indictment.

*The Contents of the Laundry Bag.*

Appellant argues that the trial court committed prejudicial error in admitting into evidence the contents of a small laundry or ditty bag found in the possession of appellant at the time of the alleged rape. The bag contained two six-foot lengths of rope, a pair of black gloves, a woman's scarf, and five or six pairs of soiled women's panties.

After the testimony of the victim and the other material witnesses had been presented, this evidence was offered by the state, together with a knife and toy pistol also found in appellant's possession at the scene, for purposes of demonstrating appellant's state of mind and intent at the time. With reference to the offer of the panties in particular, counsel for the state indicated that

my argument is that if he had them with him, that he that particular night had a sexual head-of-steam, so to speak; and that having those, together with the fact that he came prepared with a knife and a

---

1. Taggard v. State, 500 P.2d 238, 242 (Alaska 1972). *See* Sleziak v. State, 454 P.2d 252, 261 (Alaska 1969); State v. Parks, 437 P.2d 642, 644, 37 A.L.R.3d 605 (Alaska 1968); Crim.R. 6(q).

gun and a six-foot piece of rope, all add up to—point to what type of a sexual head-of-steam he had.

Appellant objected to the relevancy of this evidence, and its potential inflammatory nature, arguing that the state could not sufficiently demonstrate any connection between the fact that appellant had been carrying these undergarments at the time and the likelihood that rape as opposed to consensual intercourse had occurred.[2] In response to this challenge, and in an effort to establish the probative value of this fact, the trial court required the state to substantiate the fact that such a connection existed. To this end the court accepted the state's offer of proof on the matter and allowed it to present—out of the presence of the jury—the expert testimony of Dr. Rollins, a qualified psychiatrist, on the question of the medical import of this evidence.

As is admitted by the state in its brief on appeal, the testimony of Dr. Rollins is less than totally dispositive. A review of his lengthy testimony reveals that he was markedly hesitant about many of his conclusions, admitting that absent considerably more information on appellant's psychological makeup he could not state with certainty the exact significance of appellant's carrying of the panties. He nevertheless indicated that as a medical conjecture this circumstance was closely related to "some kind of sexual gratification", and probably indicated a form of fetishism. Moreover, a "reasonable medical probability" existed that the carrying of these objects "acted as a kindling or stimulant to sexual conduct". The presence of the panties, however, did not "in and of itself" automatically indicate a predisposition to effect forcible intercourse, and, assuming that the panties were indicative of fetishism, such fetishism might even be "inconsistent" with an act of rape. The doctor also admitted that though as a juror he would consider the

panties a material and significant fact, there was a risk that this information, considered alone, could be "tremendously distorted" by the jury.

Dr. Rollins testified, however, that there was a "distinct medical possibility" that one given to fetishism—which is indicative of sexual deficiency or aberration—would feel that sexual gratification with the opposite sex could not be obtained "unless he takes it by force." Moreover, considering the totality of the circumstances in the case rather than the presence of the panties in isolation, he said there was probably "more than just coincidence" between the appellant's carrying of them and a claim of forcible rape. In fact, a significant connection between the two was probable.

Ultimately, in response to a specific inquiry propounded by the court, the doctor testified that the fact that appellant was carrying the panties, considered in the light of all the evidence, established a medical probability that it was "more likely that rape rather than consensual intercourse occurred," and that he was thereby led to the conclusion that "this was a forced relationship."

In closing, Dr. Rollins stated that although there was a possibility that the jury could distort the medical significance of this evidence, " . . . the risk of providing the material to the—to the jury, in my view, should be taken."

On the basis of this testimony the trial court concluded that a reasonable connection had been established between the presence of the panties and the commission of the crime charged, and that the evidence had been shown to have sufficient probative value to overcome any possible prejudicial effect from its admission. It thereupon ruled that the evidence was admissible. Appellant here asserts that this ruling was error, arguing both that the evidence was irrelevant and that its inflammatory

---

2. Although appellant objected to admission of the "contents" of the laundry bag, in his brief on appeal his argument is limited to the alleged error in admitting only the women's panties.

nature outweighed any probative value it might have.

■ We have stated that

[i]n order to be admissible, evidence must be both relevant and material; it must be both probative of the proposition it was used to support, and supportive of an issue in the case. . . . In order to be relevant, evidence must simply make a proposition more probable than it would be without the evidence.[3]

It is also clearly recognized that the determination of relevancy does not depend upon any showing that the particular item of evidence, considered in isolation, furnishes conclusive proof of the ultimate fact to be inferred,[4] but that such evidence "need only advance an inquiry."[5]

■ The question of the admissibility of evidence, however, does not stop here, for there are several counter-balancing factors which may require the court to exclude even relevant evidence in borderline cases.[6]

Thus, this Court has declared that

[t]he court may exclude relevant evidence if it finds that its probative value is outweighed by the risk that it will have a prejudicial effect on the jury, confuse the issues, or mislead the jury. . . . The court must balance the probative worth against those countervailing harms.[7]

The resolution of this question lies within the sound discretion of the trial judge, whose determination should be reversed only upon a showing of a clear abuse of discretion.[8]

Appellant argues that the state failed to show "any logical connection" between the commission of the crime of rape and the possession of the laundry bag and its contents, and that this evidence was therefore irrelevant. Its position is based on what appellant terms the "ambiguous and speculative responses" of Dr. Rollins, and the fact that he admitted that there were many possible explanations for the presence of these articles in appellant's possession.

■ While one may agree that the testimony presented by the state in its offer of proof was less than conclusive, it cannot be said that no connection was established. A review of the doctor's testimony shows he eventually concluded that as a matter of medical probability such a connection was present. It is not necessary that evidence, to be deemed relevant, do any more than be "probative of the proposition it was used to support," making that proposition "more probable" that it would be without it. Appellant's arguments are aimed only at the weight of the demonstration and do not detract from the fact that a showing of such probability was in fact made.[9] It consequently cannot be said that the trial court clearly erred in its ruling. On the basis of the record before us, it seems difficult to challenge that the evidence was probative and material at least as to the question of appellant's sexual predisposition, an issue which seems clearly material in a rape case such as this.

3. Gordon v. State, 501 P.2d 772, 774 (Alaska 1972) (footnote omitted), *citing* Mitchell v. Knight, 394 P.2d 892, 894 (Alaska 1964); C. McCormick, The Law of Evidence § 152, at 319 (1954).

4. C. McCormick, Law of Evidence § 185, at 436 (2d ed. 1972).

5. 501 P.2d at 774 (footnote omitted).

6. C. McCormick, *supra* note 4, at 438–39. *See* Kugzruk v. State, 436 P.2d 962, 967 & n. 20 (Alaska 1968).

7. Burgess Const. Co. v. Hancock, 514 P.2d 236, 237 (Alaska 1973) (citations omitted).

8. *See* C. McCormick, *supra* note 4, at 440, n. 35, and cases therein cited. *See also,* Bertram v. Harris, 423 P.2d 909, 918 (Alaska 1967) (applying this rule to the question of the admissibility of demonstrative evidence).

9. It may be noted that appellant offered the testimony of another expert who, according to appellant, was prepared to refute that the carrying of the panties was probative of the issue of whether rape or consensual intercourse occurred. The trial court concluded, however, that a "battle of the experts" would not, after the lengthy testimony of Dr. Rollins, be of assistance to it in making its ruling on admissibility.

Appellant's objection, moreover, is in many ways similar to one raised in Gordon v. State.[10] There we concluded that the defendant's remarks that he would like to have intercourse with the victim were properly material and relevant to the issue of whether or not the defendant had a pre-existing intent to rape her. Though the connection is more tenuous here, an apparent form of aberrant sexual conduct —though not actually proof of a clear intent to commit rape—has been concluded by a qualified psychiatrist to be more than coincidental with such an act; to be, in fact, of such character as to make rape more probable than consensual sexual activity. We are not persuaded that the court, in making such an exhaustive inquiry into the medical significance of this evidence, erred in ultimately giving credence to this expert opinion.

[image reference placeholder] Appellant also contends that the proffered evidence was "highly inflammatory," that it could be expected to elicit highly emotional responses from a jury, and that the court consequently erred in not concluding that this inflammatory character outweighed the probative value of the evidence. Appellant does not deny that a balancing test is required here, but draws our attention to several cases which have reached the conclusions which he suggests.[11] Neither appellant's argument nor the case authority which he cites necessitates a reversal of the trial court's ruling that the risk of prejudice was more than balanced by the probative value of the evidence.[12] Moreover, the introduction of the women's panties in evidence was made without comment, and the court subsequently made every effort to see that any potential inflammatory impact was minimized.[13]

10. 501 P.2d 772, 774 (Alaska 1972).

11. Van Nostrand v. State, 51 Ala.App. 494, 286 So.2d 903 (Ala.1973) (introduction of picture of defendant with long hair was improper in prejudicially connecting him with "hippies" and the "drug scene"); People v. Lewis, 6 Ill.App.3d 101, 285 N.E.2d 168 (1972) (evidence of presence of hypodermic needles must be considered in light of fact that narcotics usage is regarded by much of society with aversion and contempt); State v. Golladay, 78 Wash.2d 121, 470 P.2d 191 (1970) (evidence that defendant charged with rape had attempted to contact a prostitute on the night of the crime was in no way connected with the victim, improperly inflammatory and had no proper bearing on the crime); State v. Huff, 76 Wash.2d 577, 458 P.2d 180 (1969) (statement by deceased victim improperly prejudicial in eliciting sympathy for defendant and contempt for the victim).

12. The case of State v. Golladay, 78 Wash. 2d 121, 470 P.2d 191 (1970), upon which appellant bases much of his argument, may be distinguished from the situation here. There the major thrust of the opinion was that evidence of the defendant's earlier visit to a prostitute on the night in question was improper because it could not be shown
how the fact that defendant knocked on the door of a reputed house of prostitution would have *any* bearing on any element of the crime with which he was charged.

470 P.2d at 205 (emphasis added). Since this evidence was deemed "inflammatory on its face," the court concluded that its admission could only unduly prejudice the defendant's right to a fair trial. In the instant case, however, we have already seen that the evidence in question has been shown to have a significant bearing on the issue of whether rape as opposed to consensual intercourse took place.

13. It is noteworthy that the court was commendably responsive to defendant's concerns in this regard, even after it had allowed the admission of the panties. It instructed the prosecution that it did not consider it proper for the state to comment on this evidence in its closing argument since such comment was unnecessary and "might tend to inflame the jury." Moreover, in consideration of this risk the court additionally included a specific instruction to the jury on the inappropriateness of judging the character of the accused:
In considering the evidence in this case you are to bear in mind that the character of the defendant had not been placed into issue and is not an appropriate subject for your deliberation. Your decision in this case must be based upon the evidence presented as it bears upon the elements of the alleged offense rather than upon speculation as to the character of the accused.
Jury Instruction No. 16A.

In view of the discretion granted the court in this matter, and considering all the evidence and the circumstances under which it was presented, we cannot say that any abuse of discretion has been shown.[14] The admission into evidence of the contents of the laundry bag was not error.

### The Sentence.

Newsom was sentenced to imprisonment for 15 years. He claims this was excessive.

At the time of the sentence, the judge conducted a rather comprehensive hearing. Newsom's counsel called three witnesses to testify on his client's behalf—Robert Spinde, a probation officer, Dr. Rader, a psychiatrist, and Tom Buckner, a vocational rehabilitation counselor.

Spinde testified that he could not say with absolute certainty that society would be safe with Newsom not incarcerated, that Newsom should have some type of vocational training, and that a work release program would be a good starting point.

Dr. Rader testified that Newsom was not particularly violent or malicious, that if the victim had resisted there would have been no copulation, that Newsom worked well in a probation situation and would be fine as long as things were going well, and that a work release program would not only adequately protect society from any danger Newsom would possibly pose but would be very helpful to Newsom in providing him the opportunity to work in the community. In sum, Dr. Rader's recommendation was to give Newsom vocational training under supervision, concluding that some sort of a control program such as probation would be sufficient to protect society in Newsome's case.

Buckner, the vocational rehabilitation counselor, testified that he had worked well for two years with Newsom when he had been on parole for a previous sex-related offense, that he saw Newsom about once a week, that Newsom had made progress, that there was nothing to be gained in terms of rehabilitation by incarceration in a penal institution, and that he was in favor of a work release program.

There was also available to the court the presentence report of Probation Officer Leslie McKnight. He noted that Newsom had been convicted of assault with intent to commit rape on a young girl in 1969, was released from custody sometime in March, 1972, and that he had finished his probation in the latter part of August, 1973. He also stated that Newsom committed the crime of rape in this case only a week or so after being released from probation. Probation Officer McKnight concluded his report by saying:

It appears that this defendant has begun to establish the uniform and consistent pattern of sex delinquency that he appears unable to control, and in this regard it is felt that the community needs protection from this assaultive behavior pattern.

McKnight then recommended that probation be denied.

In concluding the sentencing hearing, the trial judge expressed doubt as to Dr. Rader's testimony that if the victim had resisted Newsom would not have continued with the rape. The judge based his concern on the fact that Newsom had with him at the time a plastic toy gun, a knife, two pieces of rope, and a bag full of women's panties. It was the judge's opinion that these articles, together with the fact that Newsom had previously been convicted of an at-

---

14. Nor can we from the record before us even conclude with fair assurance that the jury was in fact substantially swayed by the reception of this evidence. *See generally,* Love v. State, 457 P.2d 622, 629–32 (Alaska 1969) (discussing analogous considerations with respect to the concept of harmless error). Not only are we unable to find any indication that the jury was in any way swayed by this evidence, we find it difficult to envision that such could be the case. We also note that the jury had before it in addition an impressive amount of largely unrebutted incriminating evidence, including not only the testimony of the victim and the other material witnesses but the other items of objective evidence presented by the state.

tempt to commit rape on a young girl, whom evidence indicated he had threatened with a knife, showed that the potential for violence did exist and that Newsom intended to carry out the rape in this case even if more force had been necessary.

The judge stated that he was heartily in favor of rehabilitation, that Newsom was not beyond rehabilitation, and that he was capable of ultimately making his way into a society in which he would be willing to conform to its standards. But in view of the circumstances of the rape in this case and the attempted rape for which Newsom had been previously convicted on a plea of guilty, the court expressed concern about the need to protect women against the type of conduct Newsom had exhibited on those two occasions.

The judge said he was not opposed to work release for persons for whom it is appropriate, but believed in the circumstances here a work release structured within the sentence was not appropriate. He stated, however, that if the Division of Corrections had a means of rehabilitating Newsom through work training, it would meet with the approval of the court.

The judge concluded his remarks by stating that his sentence to be imposed would have to act as a deterrent to other persons proposing to commit the crime of rape, and that punishment of Newsom for the offense was going to be a part of the objective in imposing sentence.

 As we stated in State v. Chaney,[15] forcible rape ranks among the most serious crimes. The reason such a crime is most serious is because it amounts to a desecration of the victim's person which is a vital part of her sanctity and dignity as a human being. Although the perpetrator of such a crime may not be beyond rehabilitation, which the judge recognized in this case, the crime itself deserves community condemnation; in addition to serving rehabilitative purposes the sentence must reflect such condemnation as well as act as a deterrent to the offender and to others.

 In determining whether a sentence is excessive, we are guided by article 1, section 12 of the Alaska Constitution which provides, in part:

Penal administration shall be based on the principle of reformation and upon the need for protecting the public.

Multiple goals are encompassed within these broad constitutional standards. We spoke of them in our decision in State v. Chaney, where we said:

Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penalogical treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves.[16]

In applying the doctrine of *Chaney* in this case, we are guided by the rules set forth in the cases that followed *Chaney*. First of all, we have said that the sentencing judge must determine the priority and relationship of the sentencing objectives in any particular case.[17] Secondly, we have held that in imposing a sentence a judge should not place too much emphasis on punishment of the offender, and not enough attention to his rehabilitation potential.[18] Thirdly, we have held that a

---

15. 477 P.2d 441, 446 (Alaska 1970).

16. *Id.* at 444.

17. Asitonia v. State, 508 P.2d 1023, 1026 (Alaska 1973).

18. Christian v. State, 513 P.2d 664, 670 (Alaska 1973).

sentence will be modified only in those cases where we are convinced that the sentencing court was clearly mistaken in imposing the particular sentence.[19] And finally, we have held that in order for appellate review to be effective we must ourselves weigh the factors which properly enter into determination of the sentence, because only in this manner can we be assured that the limits of sound discretion of the sentencing judge have been observed.[20]

▆▆ The judge stated in this case that punishment for the offense was going to be part of the court's objectives in imposing sentence. But we do not believe that the judge placed undue emphasis on punishment, or community condemnation of the offender. Because of Newsome's prior attempt to commit rape, and the actual forcible rape in this case, the judge was obliged to balance the goal of rehabilitation against the need to protect the public and to deter not only Newsom but others from committing similar crimes.

In imposing sentence, the judge did not foreclose the potential use of methods of rehabilitation such as work release or, perhaps, parole. Under AS 33.30.250(a), which permits the Commissioner of Health and Social Services to grant work furloughs, the judge did not, as he might have, order that Newsom not be granted such a furlough.

We do not find that the judge was clearly mistaken in imposing the sentence he did. He considered and attempted to balance the various objectives of sentencing as set forth in *Chaney,* without placing undue reliance on any particular objective. A 15-year sentence is a long time. But Newsom is not foreclosed from parole at the parole board's discretion after serving one-third of his sentence,[21] or from work releases or furloughs at the discretion of the Division of Corrections of the Department of Health and Social Services. Reformation is not beyond the realm of possibility and the judge made it possible to achieve that by leaving to the discretion of the Commissioner of Health and Social Services and the parole board the further disposition of this case.

The judgment is affirmed.

ERWIN, J., did not participate.

---

19. McClain v. State, 519 P.2d 811, 813–14 (Alaska 1974).

20. Christian v. State, 513 P.2d 664, 670 (Alaska 1973).

21. AS 33.15.080 provides:
If it appears to the board from a review that a prisoner eligible for parole will, in reasonable probability, live and remain at liberty without violating the laws, or without violating the conditions imposed by the board, and if the board determines that his release on parole is not incompatible with the welfare of society, the board may authorize the release of the prisoner on parole. However, no prisoner may be released on parole who has not served at least one-third of the period of confinement to which he has been sentenced, or in the case of a life sentence, has not served at least 15 years.