Elijah COLEMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 2331.

Supreme Court of Alaska.

July 14, 1976.

Brian Shortell, Public Defender, and Phillip P. Weidner, Asst. Public Defender, Anchorage, for appellant.

Avrum M. Gross, Atty. Gen., Juneau, and Joseph D. Balfe, Dist. Atty. and Stephen G. Dunning and Ivan Lawner, Asst. Dist. Attys., Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

ERWIN, Justice.

Elijah Coleman appeals from a conviction on two counts of rape and one count of robbery. Three issues are presented in this appeal: first, whether the trial court erred in failing to suppress evidence which was utilized in securing Coleman's conviction; second, whether the indictment against Coleman should have been dismissed because of alleged irregularities which occurred during the grand jury proceedings; and third, whether the sentence imposed by the trial court was excessive.

In August, 1973, Mrs. S. was employed as a sales clerk in the Salvation Army Store at Sixth and H Streets in Anchorage, Alaska. Because the family car was being repaired, she normally took a bus to her job and, since she usually got off work after the buses had ceased running for the evening, walked to her home near the Russian Jack Springs area.

On the evening of August 15, Mrs. S. left the downtown area at about 7:45 p.m., carrying with her among other items a blue First National Bank money bag with approximately $18.00 of the Salvation Army's money for safekeeping. As she walked along a wooded ski trail through the Russian Jack Springs area, she was attacked from behind by a man, forced off the trail, pushed to the ground, and raped. Subsequently, the assailant asked Mrs. S. whether she had any money, and she surrendered the blue bank bag. Upon being released, she ran home and immediately reported the incident to the Anchorage Police Department by telephone.

The police dispatcher received her call at 9:30 p.m. and immediately relayed it by radio to Officers Walker and Swensen who were riding together on patrol about three-quarters of a mile from the Russian Jack Springs area. The message reached the officers as a "Code 4" dispatch (indicating a crime in progress or one that has just occurred) to investigate a "strong-arm" robbery, i.e., a robbery accomplished by force but without weapons, which had just taken place near the Russian Jack Springs Golf Course. The dispatch also contained the following information: that the suspect was a short[1] black man wearing a white T-shirt and levis, carrying a blue bank bag containing stolen cash, who had left the scene of the crime in a northbound direction. The dispatch did not contain any information concerning the suspect's mode of transportation.

Although the officers were dispatched to the victim's house, since it was such a short time after the call Officer Walker decided to swing through the Russian Jack Springs area to see if he could intercept the suspect. The officers proceeded to the turnoff to the Russian Jack Springs Golf Course, north of the scene of the crime, and arrived within 1 to 1½ minutes after the police call. There they observed a yellow Fairlane automobile leaving an infrequently used area[2] east of the driveway,

---

1. Another account was that the dispatch described the suspect as either 5′ 6″ or 5′ 7″ tall, and Coleman states that his height is actually 5′ 11″.

2. This area was not a parking lot, but rather a wide spot in the road that was sometimes, but not normally, used as a parking area.

headed west. As the two vehicles approached each other from opposite directions, the officers saw that the driver of the automobile, who was operating the car in a legal manner, was black, was wearing a white T-shirt, and "looked short." One of the officers noted that the driver's facial expression showed a marked reaction to the officers' observations. The officers then made a U-turn and halted the automobile in the manner of a routine traffic stop. The officers radioed that they had stopped the suspect; it was 9:32 p.m. The officers approached the car and the driver was asked for his driver's license. The suspect exited from his car, whereupon Officer Walker observed a blue bank bag on the front floor of the passenger seat. At that point the suspect, identified as Elijah Coleman, was arrested and the bag was seized as evidence.

The grand jury indicted Coleman for rape, sodomy and robbery. Prior to trial he brought motions to dismiss the indictment and to suppress the evidence of the stolen property. Both were denied. Coleman was tried by a superior court jury in April, 1974, and was convicted on the rape and robbery counts but acquitted of the charge of sodomy. Thereafter, he entered a plea of guilty to another charge of rape involving a different victim. The trial court sentenced him, in essence, to ten years imprisonment; and he now appeals from his conviction and sentence.

## I. THE INVESTIGATIVE STOP

It is not disputed that probable cause to arrest Coleman existed once the police knew of the existence of the blue bank bag in the front seat of his vehicle. Coleman contends, however, that the police used constitutionally impermissible procedures in discovering the bank bag; specifically, he asserts that the officers had no right to stop his automobile in the first place. The State, on the other hand, argues that the officers' actions in halting Coleman's car were justified under the "investigative stop" doctrine and thus the bag, which was in plain view when Coleman exited the vehicle, was properly seized.

In two previous cases involving investigative detention not at first amounting to an arrest, this court recognized the principle that a police officer with a reasonable suspicion that imminent public danger exists or serious harm that has recently occurred was caused by a particular person may stop that person. In *Goss v. State*,[3] a state police officer on patrol shortly after midnight just outside of Anchorage observed a car drive away from the side of a building where a distributorship business was located and proceed for about half a block without its headlights on. The officer followed the car, and after it had turned around and headed in the opposite direction, stopped it. The court concluded that the officer was in his lawful authority in making the stop:

> When the officer stopped the car he was doing nothing more than conducting an investigation in response to circumstances that aroused his suspicions. Considering the lateness of the hour, the fact that the car was seen coming from the side of the building rather than from the parking lot in front, and that it was being driven without its headlights on, we believe the police officer had the right and the duty to make a prompt investigation, which required him as a matter of practical necessity to stop the car and question the occupants.[4]

In *Maze v. State*,[5] a city police officer observed the defendant standing on a window sill and holding onto the top of a metal grillwork on the window of a loan company office. The officer shined his flashlight on the defendant, who alighted and walked toward a nightclub. As the defendant neared the entrance of the club, the officer shouted and ran after him. The defendant had run into the club's out-

---

3. 390 P.2d 220 (Alaska 1964), *cert. denied*, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964).

4. *Id.* at 224.

5. 425 P.2d 235 (Alaska 1967).

side entrance when the officer grabbed him. The officer asked him what he was doing on the window sill of the loan company, and the defendant said he did not know what the officer was talking about. The officer then noted that the window of the loan company office was broken and arrested the defendant. The court noted that cause existed for the stop and for the arrest, stating:

> In *Goss v. State* we held that police officers have the right to stop and question a person under suspicious circumstances, and if probable cause is then found to exist, the person may be arrested.[6]

Subsequent to our decisions in *Goss* and *Maze,* the United States Supreme Court in *Terry v. Ohio*[7] likewise adopted the "investigative stop" concept. In *Terry* a Cleveland detective with 39 years of experience watched two men alternatively leave a corner on which the other was stationed, walk up a particular street, peer into the window of either a jewelry store or an airline office, and then return to the corner to converse with the other. This procedure was repeated several times by both men. During this time a third man approached the corner, spoke briefly with the two men, and departed. The two men then left the corner and again met the third man on another street. The detective was apprehensive about their actions and suspected them of planning a robbery or burglary. The detective approached the three men, identified himself, and asked for their names. Receiving only a mumbled response, he "frisked" the men and discovered fully-loaded weapons on two of them. Both men were convicted of the offense of carrying a concealed weapon.

In upholding *Terry's* conviction[8] the court recognized,

> . . . that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.[9]

The court, however, rejected the notion that such an investigatory stop and limited search was not subject to the requirements of the Fourth Amendment. The court stated that the central inquiry under the Fourth Amendment is to "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."[10] Thus the governmental intrusion is subject to the Fourth Amendment, and:

> "Search" and "seizure" are not talismans. We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a "technical arrest" or "full-blown search."

> In this case there can be no question, then that Officer McFadden "seized" petitioner and subjected him to a "search" when he took hold of him and patted down the outer surfaces of his clothing.[11]

The court refused to apply the requirement of "probable cause" contained in the Fourth Amendment to such police actions. The court limited the requirement of probable cause to situations which historically have been and practically are subject to the warrant procedure.

> But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as

---

6. *Id.* at 238 (footnote omitted). The reasoning of *Goss* and *Maze* was grounded in Art. I, § 14 of the Alaska Constitution.

7. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. Following the grant of the writ of certiorari, the other petitioner died.

9. *Id.* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906–07 (1968).

10. *Id.* 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904.

11. *Id.*

a practical matter could not be, subjected to the warrant procedure. *Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.*[12]

Using the general test of balancing the governmental interest justifying the official intrusion against the invasion of the constitutionally protected interests of the private citizen, the court concluded that:

> . . . the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?[13]

Four years later the United States Supreme Court in *Adams v. Williams*[14] devoted some consideration to the justification for a "stop" as a separate issue. In *Adams* a police officer was alone early in the morning in a high-crime area when a known informer approached his cruiser and told him that an individual seated in a nearby vehicle was carrying narcotics and a gun at his waist. After calling for assistance on his radio, the officer approached the vehicle to investigate the informant's tip. The officer tapped on the car window and asked the occupant to open the door. When the man rolled down the window instead, the officer reached into the car and removed a fully-loaded revolver from the occupant's waistband. He was then arrested for unlawful possession of the hand gun, and a search incident to the arrest disclosed that he was carrying heroin. The court concluded "that the policeman's actions . . . conformed to the standards . . . laid down" in *Terry*.[15]

Noting that

> . . . *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response [between an arrest based on probable cause and simply allowing a crime to occur],

the intermediate response being a "reasonable investigatory stop," the court stated:

> A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.[16]

With the foregoing in mind we proceed to the facts of the case at bar.[17]

---

12. *Id.* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905 (emphasis added; footnote omitted).

13. *Id.* 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (footnote omitted).

14. 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

15. *Id.* 407 U.S. at 145, 92 S.Ct. at 1923, 32 L.Ed. at 616.

16. *Id.* 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617 (citations omitted).

17. The only other case in which the United States Supreme Court has applied the "stop and frisk" criteria is *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In *Brignoni-Ponce*, the only issue presented was whether a roving patrol could stop a vehicle in an area near the border and question its occupants when the only ground for suspicion was that the occupants appeared to be of Mexican ancestry. Although the court ultimately held that the particular stop was unjustified, there was an extended discussion of the purpose and principles of the "investigative stop" doctrine. The only post-*Terry* case arising in Alaska wherein the problem of investigative stops is touched upon is that of *Mattern v. State*, 500 P.2d 228 (Alaska 1972). In *Mattern* the majority opinion made the following observation at footnote 15:

> Our brother Erwin in his concurring opinion concludes that the police action in this case was legitimate under the stop and frisk doctrine enunciated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968). We do not feel that this case is a proper vehicle for discussion of the stop and frisk question. There is language in our opinion in *Goss v.*

Within minutes after receiving information that a strong-arm robbery was in progress or had just occurred near the Russian Jack Springs Golf Course, the officers proceeded to the area in which the crime had been committed. Upon arriving at the scene less than two minutes later, they observed a vehicle exiting from Russian Jack Springs Park on a little-used side road, driven by a black man in a T-shirt who appeared to be short. Having been informed by the radio dispatch that the suspect had these physical characteristics, the officers stopped the car.

■ In light of the facts known to the officers, we think that they "had the right and the duty to make a prompt investigation which required [them] as a matter of practical necessity to stop the car and

question"[18] Coleman. The stopping and questioning of Coleman by the officers was not an arrest but was a reasonable course of action in light of the circumstances confronting them; and being reasonable, it was lawful under the Fourth Amendment to the United States Constitution and Art. I, § 14 of the State Constitution.[19]

■ We do not believe that our rule permitting temporary detention for questioning in certain cases, i.e., cases where the police officer has a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred, conflicts with the Fourth Amendment[20] or the State Constitution.

It strikes a balance between a person's interest in immunity from police interference and the community's interest in

*State*, 390 P.2d 220 (Alaska 1964), which approves of the stop and frisk practice. However, we note that, unlike many jurisdictions which allow this practice, Alaska does not have a statute authorizing the police to forcibly stop a citizen on less than probable cause to arrest. It should also be noted that several members of the United States Supreme Court have begun to re-evaluate the *Terry* opinion. In a recent opinion Justice Brennan expressed the same concern of Judge Friendly that, unless it is held in check, there is a danger that *"Terry* will have opened the sluicegates for serious and unintended erosion of the protection of the Fourth Amendment." *Adams v. Williams*, 407 U.S. 143, 153, 92 S.Ct. 1921, 1927, 32 L.Ed.2d 612 (1972) (dissenting opinion).

It is noted that the particular concern expressed by Justice Brennan and Judge Friendly, quoted in the *Mattern* opinion, was that the doctrine of stop and frisk enunciated in *Terry* should not be extended beyond situations requiring immediate police response to protect the public in serious cases where there is likelihood of imminent danger about to occur or where serious harm has recently been perpetrated to persons or property. While we agree with the view expressed by Justice Brennan and Judge Friendly, their concern is not applicable in the case at bar.

18. *Goss v. State*, 390 P.2d 220, 224 (Alaska 1964), *cert. denied*, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964).

19. Had Coleman been walking down the same street, we think it would have been reasonable

for the officers to take the opportunity to question him about his activities in the area. We are unwilling to distinguish between persons who travel by auto and those who travel by foot. In fact, there might be more justification for a policeman stopping an automobile leaving the vicinity of a suspected crime, for in such a situation, if action is not immediately taken, there is not likely to be another chance.

20. The concept of an "investigative stop" under suspicious circumstances is not a novel one, and there were a number of cases which predated our decisions in *Goss v. State*, 390 P.2d 220 (Alaska 1964), and *Maze v. State*, 425 P.2d 235 (Alaska 1967), and the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See U. S. v. Rios*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *U. S. v. Vita*, 294 F.2d 524 (2nd Cir. 1961); *U. S. v. Bonanno*, 180 F.Supp. 71 (D.C.N.Y.1960); *People v. Mickelson*, 59 Cal.2d 448, 30 Cal.Rptr. 18, 380 P.2d 658 (1963); *People v. Gibson*, 220 Cal.App.2d 15, 33 Cal.Rptr. 775 (1963); *State v. Gulczynski*, 120 A. 88 (Del.1922); *Cornish v. State*, 215 Md. 64, 137 A.2d 170 (1957); and *State v. Hatfield*, 112 W.Va. 424, 164 S.E. 518 (1932). For a survey of recent decisions, *see U. S. v. Collins*, 532 F.2d 79, 19 Crim.L.Rep. 2008 (8th Cir. 1976); *U. S. v. Hall*, 525 F.2d 857 (D.C.Cir. 1976); *U. S. v. Miller*, 468 F.2d 1041 (4th Cir. 1972); *State v. Kelly*, 543 P.2d 780 (Ariz. 1975); *People v. Atmore*, 13 Cal.App.3d 244, 91 Cal.Rptr. 311 (1970); and *People v. Whalen*, 213 N.W.2d 116 (Mich.1973).

law enforcement. It wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified.[21]

 Having found that the investigatory stop was proper under the circumstances, we conclude that the bank bag which was in plain view was legitimately seized and the trial court did not err in refusing to suppress it as evidence.

## II. Grand Jury Proceedings

Although no provision of the United States or Alaska Constitutions specifically guarantees the right of an accused to be indicted by a grand jury free of prosecutor instigated prejudice, a strong historical basis exists for holding that the grand jury should operate to control abuses by the government and protect the interests of the accused.[22]

Article I, § 7, of the Alaska Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." The Hawaii Supreme Court in *State v. Joao*,[23] and the Arizona Court of Appeals in *State v. Good*,[24] have held that a defendant was denied due process of law when indicted by a grand jury prejudiced by the prosecutor.

The United States Supreme Court has not ruled on the issue but has inferred that a defendant is entitled to have an indictment returned by an impartial tribunal. In *Lawn v. United States*,[25] the Supreme Court said:

An indictment returned by a legally constituted *nonbiased grand jury* . . .

is enough to call for a trial of the charge on the merits. (Emphasis added)

Then, in *Beck v. United States*,[26] the Supreme Court indicated that it may be willing to extend due process protections to the indictment procedures established by the states:

It may be that the Due Process Clause of the Fourteenth Amendment requires the State, having once resorted to a grand jury procedure, to furnish an unbiased grand jury. . . .

Article I, § 8 of the Alaska Constitution states that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury." Alaska Rule of Criminal Procedure 6(i) sets out the duties of the District Attorney during a grand jury proceeding as follows:

The prosecuting attorney shall prepare all indictments and presentments for the grand jury and shall attend to their sittings to advise them of their duties and to examine witnesses in their presence.

The same duties are stated in AS 12.40.-070.

 It is the prosecutor's function to prepare indictments, present evidence thereon, and advise the grand jury.[27] It has been noted that the modern prosecutor in performing this function plays two, sometimes inconsistent, roles.[28] As an officer of the State, it is the prosecutor's duty to be an advocate; he must exert his best efforts to prosecute successfully those who have violated the criminal law. On the other hand, as an officer of the court, he is required to act as the grand jury's legal advisor, to aid but not interfere in its determination of the probability of guilt.

21. *People v. Mickelson*, 59 Cal.2d 448, 30 Cal.Rptr. 18, 380 P.2d 658, 660 (1963).

22. Johnston, "The Grand Jury—Prosecutorial Abuse of the Indictment Process," 65 J. Crim.L. and Criminology, 157–69 (1974).

23. 53 Haw. 226, 491 P.2d 1089 (1971).

24. 10 Ariz.App. 556, 460 P.2d 662 (1969).

25. 355 U.S. 339, 349, 78 S.Ct. 311, 318, 2 L.Ed.2d 321, 330 (1958).

26. 369 U.S. 541, 546, 82 S.Ct. 955, 8 L.Ed. 2d 98, 105 (1962).

27. Alaska Criminal Rule 6(i).

28. *See* Comment, Grand Jury Proceedings, The Prosecutor, The Trial Judge, and Undue Influence, 39 U.Chic.L.R. 761–765 (1972).

The American Bar Association Standards characterize the prosecutor's function in the grand jury process as follows:

Relations with Grand Jury

(a) Where the prosecutor is authorized to act as legal advisor to the grand jury he may appropriately explain the law and express his opinion on the legal significance of the evidence but he should give due deference to its status as an independent legal body.

(b) The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury.

(c) The prosecutor's communications and presentations to the grand jury should be on the record.[29]

■ It is apparent that the grand jury proceedings cannot be turned into a mini-trial. The grand jury is an accusatorial body operating without a judicial officer to pass on the admissibility of evidence, and as such is charged with a determination of the probability of guilt.[30]

■ In the instant case, the grand jury's deliberation was interrupted by a request from the grand jury foreman to the district attorney. The following exchange took place:

THE FOREMAN: We haven't finished deliberating yet, but our question basically is, was there an examination of the victim in relationship to the rape charge and sodomy charge?

DISTRICT ATTORNEY: Yes.

THE FOREMAN: Can we get—is there anyone here without belaboring and looking for other witnesses, is there anyone here who can tell us what the results of these examinations were?

DISTRICT ATTORNEY: I can't tell you anything. It would have to be the doctor. He can give you the. . . .

THE FOREMAN: Well, is it in the police records?

DISTRICT ATTORNEY: I can give you the records, yes. I don't know if you can read it.

THE FOREMAN: No.

DISTRICT ATTORNEY: I mean you have them for whatever they're worth.

THE FOREMAN: No, but I mean can a—I don't feel during deliberations that the particular question that's being answered would warrant waiting to hear from a doctor. Can't the police department or one of the officers here indicate to us whether by examination there was indication of rape and sodomy or not?

DISTRICT ATTORNEY: No, that would be hearsay.

UNIDENTIFIED JUROR: The doctor is the only one that could present that testimony?

DISTRICT ATTORNEY: Yes. We can give you the lab sheets, but that's not going to tell you anything. I've looked at them.

THE FOREMAN: Can you tell us whether or not there was any indication from the. . . .

29. ABA Project on Standards Relating to the Prosecution Function and the Defense Function, § 3.5 at 87 (Approved Draft 1971). The commentary to this section notes that where the prosecutor must prosecute an indictment returned by the grand jury, it is especially important that he be free to express his opinion. A prosecutor who had conducted an adequate investigation and analyzed the evidence is in a position to furnish guidance to the grand jury on the law and the weight of the evidence and should be free to do so whether this leads to a determination to indict or not to indict. The commentary cautions that the prosecutor should not "take advantage of his role as an *ex parte* representative of the State before the grand jury to unduly or unfairly influence it in voting on charges before it." *Id.* at 88.

30. *See Taggard v. State*, 500 P.2d 238 (Alaska 1972); *Burkholder v. State*, 491 P.2d 754 (Alaska 1971).

DISTRICT ATTORNEY: I can't tell you because that would be hearsay too and I'm not even testifying.

THE FOREMAN: Can you help us out in any manner, ways or means other than calling a doctor in. . . .

DISTRICT ATTORNEY: No.

THE FOREMAN: . . . as to the answering of our question?

DISTRICT ATTORNEY: *I don't think calling a doctor is needed. I think you've heard enough to have this person tried.* I don't think there's—well, I haven't talked to the doctor. I don't know anything but what I've seen from these reports. (Emphasis added)

. . . . . .

UNIDENTIFIED JUROR: I'd like to say something, but I don't know if I should or not. I don't think we're going to have justice in voting—or not justice really—I don't think we're going to get a proper vote if we don't hear from a doctor personally.

DISTRICT ATTORNEY: Well, now you've got to remember you're not trying these people.

UNIDENTIFIED JUROR: Well, I know it but we. . . .

DISTRICT ATTORNEY: *And we can't go calling in experts on every case.* You've heard a victim tell you this. If you don't—you know what the burden of proof is. If it's unexplained—or uncontradicted, if it would merit a conviction, then you come out with a true bill and you've heard her testimony and you found—you've had an officer testify he found the defendant right where she said he would be and he had the bag and I don't think it. . . .

UNIDENTIFIED JUROR: Then it's up to him to disprove it, right?

DISTRICT ATTORNEY: Well, not that necessarily. We still have to show you enough proof here to warrant the indictment. He never has to come in

and prove his innocence, but you can't expect us to put on the trial that we have put on in front of the petit jury. But now. . . .

UNIDENTIFIED JUROR: If there were a trial. . . .

DISTRICT ATTORNEY: . . . you certainly have a right to call any witnesses you want.

UNIDENTIFIED JUROR: If there were a trial the doctor would testify.

DISTRICT ATTORNEY: Oh, yes. (Emphasis added)

Coleman objects to two statements by the district attorney during this exchange: "I think you've heard enough to have this person tried" and ". . . we can't go calling in experts on every case." Both of these allegedly improper statements by the district attorney and the whole exchange set out above show undue prosecutorial influence over the grand jury, according to Coleman.

The Alaska case dealing most directly with undue prosecutorial influence is *Anthony v. State*.[31] The court did not rule on the issue since it was not raised at trial but stated in a footnote:

> We note with disapproval comments made and solicited by the district attorney before the grand jury, referring to matters which would not have been admissible at trial. The district attorney emphasized Anthony's prior criminal record, adverted to the results of polygraph examinations, expressed his suspicion that Anthony was involved in Fairbanks drug traffic, related evidentiary details of the potential narcotics case being prepared by his office, introduced speculative testimony that a witness fled to New Orleans out of fear of Anthony, and stated, utterly without evidentiary support, that "[W]e know he's been given contracts [to kill]. . . ." We cannot condone such conduct, and we direct the district attorney's attention to §

31. 521 P.2d 486 (Alaska 1974).

3.5(b) of the American Bar Association Standards Relating to the Prosecution Function (Approved Draft 1971): "The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury."[32]

The statements made by the district attorney in the instant case are clearly not as egregious as those condemned by this court in *Anthony*. After viewing the entire proceeding, we are unable to find the portion challenged by Coleman was an improper attempt by the prosecutor to influence the grand jury, particularly where the assistant district attorney immediately reinstructed the grand jurors on the standard for determining the sufficiency of the evidence as follows:

. . . You've heard a victim tell you this. If you don't—you know what the burden of proof is. If it is unexplained —or uncontradicted, it would merit a conviction, then you come out with a true bill—[33]

UNIDENTIFIED JUROR: Then it's up to him to disprove it, right?

DISTRICT ATTORNEY: Well, not that necessarily. We still have to show you enough proof here to warrant the indictment.

■ We similarly find that the district attorney's failure to subpoena the examining physician was not error. Not all of the jurors felt the need to hear additional testimony from the examining physician. The jury foreman stated:

No, but I mean—I don't feel during deliberations that the particular question that's being answered would warrant waiting to hear from a doctor.

Furthermore, the district attorney specifically instructed the grand jurors that, "You certainly have the right to call any witnesses you want." A fair reading of the grand jury record demonstrates that, while not in the most prudent prosecutorial tradition, the actions of the prosecuting attorney cannot be said to have improperly influenced the grand jury.

■ Coleman also contends that the district attorney commented to the grand jury on his exercise of his constitutional right to remain silent after arrest. The right not be compelled in any criminal case to be a witness against oneself is secured by the Fifth Amendment of the United States Constitution and Art. I, § 9, of the Alaska Constitution. Implicit in this right is the notion that when an accused person chooses to exercise his right to silence, such silence may not be commented upon.[34]

The disputed comment arose in the following context when the district attorney was interrogating Officer Walker, the policeman who arrested Coleman:

DISTRICT ATTORNEY: Did the man make any statement to you?

WALKER: No, he didn't say a word during the entire contact.

DISTRICT ATTORNEY: I have no further questions.

THE FOREMAN: Do any of the grand jurors have any questions?

By Unidentified Jurors:

Q: He said what?

WALKER: He didn't say anything. Not—during the whole time I talked to

---

32. *Id.* at 496, note 37.

33. Alaska Rule of Criminal Procedure 6(q) states in pertinent part: "The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant."

34. *See*, for example, Alaska Rule of Criminal Procedure 26(b)(6):
 If the accused in a criminal action exercises his or her privilege not to testify or to prevent another from testifying,
 (i) no person shall make any comment thereon, and
 (ii) no presumption shall arise with respect to the exercise of the privilege, and
 (iii) no adverse inference shall be drawn therefrom by the trier of fact.

him. He didn't give me his name, didn't give me his address, nothing. I advised him of his rights and he didn't even acknowledge having been advised of them, just sat in the car.

Q: Was there ever a statement made?

WALKER: Not to my knowledge. Another officer transported him to the jail and booked him in and he didn't talk to that officer, wouldn't give him his address in there either.

＊　＊　＊　＊　＊　＊

Q: I don't quite understand. You mean the man has never been questioned on this charge?

WALKER: I didn't question him that night and there's nothing in the entire report to indicate that the investigators followed it up and questioned him. He was given an opportunity to talk, but he wouldn't say anything.

THE FOREMAN: What—excuse me. What's the law on that, Chuck, after they're advised of their rights? Apparently they don't have to say anything at all regardless of how much investigating or questioning, am I correct or . . . .

DISTRICT ATTORNEY: That's correct, yes.

THE FOREMAN: In other words he can sit there and not say anything, hum?

WALKER: That's right.

■ Coleman faults the district attorney for presenting the arresting police officer as a witness without first ascertaining whether the accused had chosen to remain silent after the arrest. If informed that the accused had exercised his Fifth Amendment right to silence, Coleman contends that the prosecutor should not have questioned the officer on this issue before the grand jury. Coleman compares this to the situation where the prosecutor compels the appearance of an accused before the grand jury with prior knowledge that the accused will rely on his privilege not to testify. Standard 3.6(e) of the American Bar Association's Standards Relating to the Prosecution Function addresses itself to this situation:

> The prosecutor should not compel the appearance of a witness whose activities are the subject of the [grand jury] inquiry if the witness states in advance that if called he will exercise his constitutional privilege not to testify.[35]

Coleman claims that by putting information about his silence after arrest before the grand jury, the district attorney prejudiced his case with evidence which would be inadmissible at trial. Coleman points to Alaska Rule of Criminal Procedure 6(r), which provides in part: "Evidence which would be legally admissible at trial shall be admissible before the grand jury," and he argues that this rule must be read to imply its inverse: evidence which would *not* be legally admissible at trial shall *not* be admissible before the grand jury. However, this proposition does not seem to be supported by Criminal Rule 6(r) itself:

> Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction. If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.

Thus, Rule 6(r) permits in compelling circumstances the use of hearsay evidence which would not be admissible at trial. In *State v. Parks*,[36] this court upheld an indictment based entirely on hearsay. In *Galauska v. State*,[37] this court stated that hearsay evidence that would be inadmissible at trial could be introduced to the grand jury when there was a compelling justification. Thus, Alaska Rule of Criminal Procedure 6(r) would not seem to prohibit the admission of evidence of Cole-

**35.** ABA Project on Standards Relating to the Prosecution Function and the Defense Function, § 3.6 at 88 (Approved Draft 1971).

**36.** 437 P.2d 642, 645 (Alaska 1968).

**37.** 527 P.2d 459 (Alaska 1974).

man's silence after arrest on the sole ground that such evidence would not be admissible at trial.

The State argues that the district attorney did not commit error by inquiring of the police officer whether Coleman had made any statement after arrest for the following reasons: Alaska Rule of Criminal Procedure 6(q) provides that the grand jury may require the prosecuting attorney to subpoena witnesses when it has reason to believe that other available evidence will explain away the charge.[38] In order to determine whether other available evidence will explain away the charge, the grand jury had the right to know if the defendant had made any exculpatory statements to the police. The district attorney properly questioned the police officer on this matter and immediately dropped the questioning when he was told that no statement had been made. It was the jurors who took up the questioning. Furthermore, questioning of the district attorney by the grand jury foreman showed that the latter understood that a defendant has a right to remain silent upon arrest. This understanding was reinforced for all the jurors by the district attorney.

We find, therefore, that there were no such irregularities which occurred during the grand jury proceeding as to warrant reversal.[39]

### III. Sentence Review

At the conclusion of the sentencing hearing, the trial judge imposed a sentence of ten years on each of the rape counts, and a sentence of seven and one half years on the robbery count, all sentences to run concurrently. Coleman contends that this sentence is excessive.

The presentence report reflects that Coleman was born in 1951, the oldest of four children. His youth was spent in Tuskegee, Alabama, where he was raised by his parents and grandparents. Coleman did not complete high school, having dropped out after the 11th grade, but he subsequently received his General Equivalency Diploma through a course in Alabama. In 1971 he joined the United States Army and received an honorable discharge in 1973. At sentencing, it was disclosed that Coleman, who was unemployed at the time the offenses in question occurred, did not have any prior record, was not a user of drugs, and was only a social drinker.

The presentence report which was furnished to the trial court prior to sentencing contains a written statement by Coleman which provides in part as follows:

> I've never raped or robbed anybody in my entire life. But, I was convicted of something I didn't do. I didn't get an honest verdict from my jury. Any honest person could see that. I didn't rape either of those two women and nobody proved in court that I did.

In imposing what was in essence a term of ten years imprisonment, the trial judge stated:

> Your attorney indicated that it would take some time for you, perhaps, to be rehabilitated and recommended to the court certain matters in which he felt that you could become rehabilitated and become a good citizen. I hope that you can be. But at the present time, because of the nature of the offense, I find that you are, in fact, a danger to this community. I will tell you that I would have unhesitatingly followed the recommendation made by your attorney if there was

---

38. Alaska Rule of Criminal Procedure 6(q) states in part:

When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced and for that purpose may require the prosecuting attorney to subpoena witnesses.

39. We take this opportunity to express the view that there is evidence that the grand jury indictment process may no longer be fulfilling its intended functions, and recommendations have been made that it should be replaced by the preliminary hearing procedure. In this regard, see Rubinstein, The Grand Jury in Alaska: Tentative Recommendations to the Judicial Council (1975).

but one count, with your background, your history, and no prior convictions; but we are not faced with merely one count here, we are faced with three. . . . It is further the recommendation of this court in both of these matters that you will be transferred to the Eagle River institution, with the further recommendation that any psychological evaluation be continued, with a view toward teaching you a skill or a craft so that you may become skilled, and that upon rehabilitation, be released from the said institution. As I stated before, I not only consider you at present a danger to the community, but I also feel because of your youth that there is hope for rehabilitation.

 As we have often stated, the primary responsibility for sentencing rests in the trial court. Our review of the record reveals that the trial judge carefully weighed the *Chaney*[40] objectives before imposing the sentence in question. In light of the nature of the crimes, herein,[41] the defendant's character, and the need for protecting society, we are unable to say that the trial judge was clearly mistaken[42] in imposing a sentence of ten years.

The judgment is affirmed.

BOOCHEVER, J., concurred with opinion in which RABINOWITZ, J., joined.

BOOCHEVER, Chief Justice, with whom RABINOWITZ, Justice, joins, concurring.

I concur in the majority opinion in all respects except for the discussion of the prosecutor's conduct in questioning Mr. Coleman before the grand jury about his silence after arrest. An inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested,[1] and evidence of silence in the face of custodial interrogation by police is not properly admissible in a trial.[2] Similarly, a prosecutor should not intentionally elicit evidence before a grand jury of an accused's silence at the time of his arrest.

A prosecuting attorney who has properly prepared his case for the grand jury will know whether the accused remained silent or offered exculpatory statements after arrest. If the district attorney knows of exculpatory statements made by an accused after arrest, it is his duty to bring this information before the grand jury. If he knows that the accused remained silent after arrest, the prosecutor should not seek to bring this out. If any member of the grand jury specifically raises this issue, the

---

40. *State v. Chaney*, 477 P.2d 441, 443 (Alaska 1970). For a review of the rules that guide the court in applying the doctrine of *Chaney*, see *Newsom v. State*, 533 P.2d 904, 911 (Alaska 1975).

41. In *State v. Chaney*, 477 P.2d 441, 446 (Alaska 1970), we stated that "[f]orcible rape and robbery rank among the most serious crimes."

42. This court has previously expressed the view that violent crimes involving physical injury to innocent people are to be regarded as our most serious offenses and are not to be treated lightly. See the following for rape cases where long-term sentences were affirmed: *Newsom v. State*, 533 P.2d 904 (Alaska 1975) (15 years) ; *Ames v. State*, 533 P.2d 246 (Alaska 1975) (8 years) ; *Torres v. State*, 521 P.2d 386 (Alaska 1974) (20 years) ; *Newsom v. State*, 512 P.2d 557 (Alaska 1973) (15 years) ; *Gordon v. State*, 501 P.2d 772 (Alaska 1972) (10 years). See

also *Lancaster v. State*, 550 P.2d 1257 (Alaska 1976), where a sentence of two years was disapproved as being too lenient.

1. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, 695–96 (1966) ; *Ivey v. United States*, 344 F.2d 770 (5th Cir. 1965).

2. *Doyle v. Ohio*, —— U.S. ——, 96 S.Ct. 2240, 49 L.Ed.2d 91, 44 U.S.L.W. 4902 (June 17, 1976) ; *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) ; *United States v. Impson*, 531 F.2d 274, 19 Cr.L.Rptr. 2172 (5th Cir. 1976) ; *Fowle v. United States*, 410 F.2d 48, 50–51 (9th Cir. 1969) ; *United States v. Nolan*, 416 F.2d 588, 594 (10th Cir. 1969) ; *United States v. Mullings*, 364 F.2d 173, 175 (2nd Cir. 1966). The practice of commenting to a trial jury upon an accused's silence after arrest has been specifically disapproved by this court in *Davis v. State*, 501 P.2d 1026, 1031 (Alaska 1972).

prosecuting attorney should explain the constitutional right to remain silent in such circumstances.

I do not find that the prosecutor's conduct amounted to reversible error in this case because it appears from the transcript that the grand jurors were subsequently made aware of the accused's right to remain silent. I cannot agree with the majority, however, that the district attorney acted properly in questioning the police officer about Coleman's response after arrest.