**Vincent S. ELDRIDGE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4320.**

Court of Appeals of Alaska.

March 26, 1993.

---

7. Virginia concedes that the issue of attorney's fees is moot in light of Charles' recent bankruptcy.

Robert B. Downes, Robert B. Downes, P.C., Fairbanks, for appellant.

Eric A. Johnson, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Vincent S. Eldridge appeals his conviction of misconduct involving a controlled substance in the third degree (possession of cocaine with intent to deliver), AS 11.71.-030(a)(1), arguing that Superior Court Judge Richard D. Savell erred in failing to suppress evidence resulting from a warrantless patdown of Eldridge's person. We remand for reconsideration.

On July 15, 1991, Donald Allen, a probation officer in Fairbanks, received an anonymous telephone tip that one of his probationers, Charles Smith, had been selling cocaine in Fairbanks. Two days later, Allen received another anonymous call informing him that Smith had travelled to Anchorage, would be returning to Fairbanks on a mid-afternoon Delta Airlines flight, and might be carrying cocaine. Allen suspected the tip to be accurate, since Smith was on probation for selling cocaine and, a month earlier, had submitted a urine specimen that tested positive for cocaine.

Through contacts with the federal Drug Enforcement Administration, Allen confirmed that Smith had travelled from Fairbanks to Anchorage on an early morning flight. Smith's unauthorized departure from the Fairbanks area was a violation of his probation conditions. Allen decided to arrest Smith for this violation when Smith's flight arrived at the Fairbanks airport. Allen recruited two other probation officers to assist him in the arrest, and the three men drove to the airport to await Smith's arrival.

Smith was not on the mid-afternoon Delta Airlines flight from Anchorage. Allen and his fellow probation officers met other airlines' mid-afternoon flights from Anchorage, but Smith did not arrive on them either. The officers decided to wait for an additional flight that was scheduled to arrive at approximately 5:20 p.m.

The officers waited for Smith in their car in the airport parking lot, where they had located the car that Smith usually drove. Shortly after 5:30 p.m., the officers saw Smith walking toward his car from the general direction of the terminal building. Eldridge walked alongside Smith. As Smith and Eldridge reached Smith's car, Smith unlocked the door; Eldridge seated himself in the passenger's seat and closed his door. Meanwhile, Smith started to enter on the driver's side of the car.

At that point, Allen approached Smith, patted him down, placed him under arrest

for violating the conditions of his probation by violating his travel restriction, and seated him in the probation officers' car. While Allen dealt with Smith, the two other officers approached the passenger's side of the car. One of the officers (who were not in uniform) displayed his badge and ordered Eldridge out of the car. Eldridge complied. The other officer immediately directed Eldridge to turn toward the car and place his hands on its roof. The officer conducted a patdown of Eldridge's person. Upon feeling a hard object in one of Eldridge's boots, the officer reached under Eldridge's pant-leg and retrieved a package that was later found to contain rock cocaine.

At the time of the stop, Allen and his companion officers had no specific information that Smith might be armed.[1] They also had no information indicating that Smith would be returning from Anchorage with a companion, they were not acquainted with Eldridge, and they did not know whether Eldridge had in fact accompanied Smith on the Anchorage flight. The officers saw nothing change hands between Smith and Eldridge, and they observed no suspicious movements or actions on Smith's or Eldridge's part, although they could view only the back of Eldridge's head after he seated himself in the passenger's seat. No one heard whether the two men exchanged words as they entered the car. All three probation officers were armed with handguns but saw no need to draw or display their weapons.

On the other hand, all three probation officers had dealt with a substantial number of narcotics cases and were aware that guns are frequently carried by persons who traffic in cocaine and that such persons frequently use companions to carry drugs. The officers characterized their patdown searches of Eldridge and Smith as an "operational procedure ... in a situation

of this nature," and as something that is done "routinely" to assure their safety.

Eldridge moved to suppress the cocaine that was found in his boot, arguing, in relevant part, that the patdown resulting in seizure of the cocaine had not been supported by a reasonable suspicion that he was armed and dangerous. Following an evidentiary hearing, Judge Savell denied Eldridge's motion. Eldridge subsequently entered a plea of no contest, reserving his right to appeal Judge Savell's ruling.[2]

■ To decide Eldridge's claim on appeal, we must initially determine whether the superior court applied the correct legal standard in upholding the challenged patdown search. This determination involves an issue of law as to which we exercise independent review. *Jackson v. Power*, 743 P.2d 1376, 1379 n. 5 (Alaska 1987). *See also United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.1984) (en banc), *abrogated on other grounds, Merchant v. Commissioner Internal Revenue Service*, 947 F.2d 1390, 1392 (9th Cir.1991).

In denying Eldridge's motion to suppress, Judge Savell considered the circumstances surrounding the disputed patdown, found that there had been good reason to suspect that Smith might be armed and trafficking in drugs, and concluded that the probation officers therefore acted reasonably in subjecting Eldridge to a patdown to assure their own safety. Judge Savell did not specifically find, however, that the officers had any articulable grounds for suspecting Eldridge himself to be armed or dangerous.

■ Although Judge Savell's findings are not entirely clear on the issue, the judge appears to have concluded that Eldridge was automatically subject to a cursory protective search for weapons because he was a companion of Smith, who was reasonably suspected of being armed and

---

**1.** Indeed, Smith was not armed and, as Allen testified at the suppression hearing, Allen evidently believed that he probably would not be armed:

 Knowing Mr. Smith, I was not too concerned about him personally, even though there always is a danger that someone can change the

way they've behaved in the past. I've known Mr. Smith for some time[.] [H]e has no history of violence and there has not been any weapons found in his possession.

**2.** *See Cooksey v. State*, 524 P.2d 1251, 1256–57 (Alaska 1974).

was being lawfully placed under arrest. On this point, Judge Savell specifically stated:

> The Court does not find that the probation officers had to articulate a reason to suspect anything other than [that] Mr. Eldridge's presence with Mr. Smith gives them the right to reasonably assure that no weapon is brought to bear, either because of the transport of a substantial quantity of cocaine or because of a possible view that a ripoff could have been taking effect on Mr. Eldridge's part and him to act out as if the probation officers were not law enforcement officers under attack.

The court's conclusion appears to have had its source in the state's legal argument opposing Eldridge's suppression motion. The state relied below, and relies here, on a line of cases engendered by *United States v. Berryhill*, 445 F.2d 1189 (9th Cir.1971), in which the court announced what has come to be known as the "automatic companion" rule: [3]

> All companions of [an] arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to assure that they are unarmed.

*Id.* at 1193.

Since *Berryhill* was decided, a number of federal courts have nominally adhered to the automatic companion rule.[4] Other courts, however, have rejected the automatic companion rule as unnecessarily broad or have simply ignored it, opting instead for a case-specific analysis of the totality of the circumstances to decide whether a reasonable suspicion has been articulated to justify a patdown of an arrestee's companion.[5]

With respect to *Berryhill's* statement of the automatic companion rule, Professor LaFave persuasively observes:

> Although on occasion this last statement in *Berryhill* has been taken literally, it is to be doubted whether such a broad rule is justified. It is noteworthy that such a broad principle was unnecessary to reach the result in that case.... Certain other decisions upholding the search of an arrestee's companion may likewise be explained upon narrower grounds....

3 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 510–11 (2d ed. 1987) (footnotes omitted).

Instead of the automatic companion rule, LaFave advocates an assessment of the degree of apparent danger based on the totality of the circumstances in each case. *Id.* at 511. LaFave goes on to say:

> Even if the companion is not sufficiently suspected so that he could be legitimately seized for investigation, the circumstances may nonetheless indicate that the officer should take appropriate precautions. Among the relevant circumstances in making an assessment of the apparent danger are the nature of the crime for which the arrest was made, the nature of the association between the companion and the arrestee, the time and place of the arrest, the number of officers who are present as compared to the number of arrestees and companions, and whether the companion has a "suspicious bulge" in his clothing or has made

---

**3.** For general discussions of the pros and cons of the "automatic companion" rule, see Notes, *The Automatic Companion Rule: an Appropriate Standard to Justify the Terry Frisk of an Arrestee's Companion?*, 56 Fordham L.Rev. 917 (1988); Comment, *United States v. Bell: Rejecting Guilt by Association in Search and Seizure Cases*, 61 Notre Dame L.Rev. 258 (1986).

**4.** For examples of cases following *Berryhill*, see 3 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 511 n. 71 (2d ed. 1987).

**5.** *See, e.g., United States v. Flett*, 806 F.2d 823, 826–29 (8th Cir.1986); *United States v. Bell*, 762 F.2d 495, 498–500 (6th Cir.1985); *United States v. Tharpe*, 536 F.2d 1098, 1100–01 (5th Cir.1976) (en banc), *overruled on other grounds, United States v. Causey*, 834 F.2d 1179 (5th Cir.1987); and *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir.1973).

any menacing movements. It would also appear to be of some significance that the companion was with the arrestee in a car or in premises or that he intruded himself into the arrest situation....

*Id.* at 511–12, and 1993 Supp. at 148.

LaFave's totality-of-the-circumstances approach—rooted in the orthodox notion of reasonable suspicion that originated with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and more recently finding expression in *Ybarra v. Illinois,* 444 U.S. 85, 94–96, 100 S.Ct. 338, 343–45, 62 L.Ed.2d 238 (1979)—seems to us to be legally sound, readily understandable, and considerably preferable to the categorical approach taken by *Berryhill.* As the court held in *United States v. Bell,* 762 F.2d 495 (6th Cir.1985):

> As to the propriety of the "automatic companion" rule, we do not believe that the *Terry* requirement of reasonable suspicion under the circumstances ... has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates. The Supreme Court has "invariably held [that] the predicate to a patdown of a person for weapons" is "a reasonable belief that he was armed and presently dangerous."

*Id.* at 499 (citations omitted).

LaFave's case-specific approach is virtually identical to the approach taken by most courts that have rejected the automatic companion rule. See particularly *Bell,* 762 F.2d at 499–502. These precedents are especially pertinent to Alaska, given the prominence our state constitution accords the right of privacy[6] and the commensurately higher standard of reasonable suspicion the Alaska Supreme Court adopted in *Coleman v. State,* 553 P.2d 40, 46–47 (Alaska 1976).

Commenting on the *Coleman* standard, this court recently said:

6.  *See* Alaska Const., art. I, § 22.

7.  *See also Peschel v. State,* 770 P.2d 1144, 1148–50 (Alaska App.1989) (holding that the availabil-

In our view, *Coleman* addresses the problem of differentiating serious from nonserious harm by espousing a flexible approach based on practical necessity, rather than a rigid standard of categorical exclusion.

*State v. G.B.,* 769 P.2d 452, 455 (Alaska App.1989).

We noted, further, "that *Coleman* recognizes that the extent of danger threatened by a potential crime ... cannot be evaluated in the abstract." *Id.* at 456. We went on to observe that the *Coleman* standard requires a case-by-case balancing of the imminence and seriousness of potential harm "against the strength of an officer's reasonable suspicion and the actual intrusiveness of the investigative stop." *Id.*[7]

Finally, we emphasized:

> In each case, compliance with *Coleman's requirement of recently committed serious harm must be evaluated with a view toward the fundamental concern of the* Coleman *court: the risk that an investigative stop based on mere suspicion may be used as a pretext to conduct a search for evidence. As indicated in* Coleman, *the fundamental inquiry in each case is whether a "prompt investigation [was] required ... as a matter of practical necessity."*

*Id.* (citations omitted).

We conclude that *Berryhill's* automatic companion rule is incompatible with the requirements of the Alaska Constitution, as interpreted by the Alaska Supreme Court in *Coleman.* Because the superior court evidently relied on the *Berryhill* standard to validate the challenged patdown in the present case, we must remand for further proceedings. On remand, the superior court is directed to reconsider its ruling by determining whether the totality of the circumstances gave rise to articulable grounds supporting a reasonable suspicion that Eldridge was armed and dangerous

ity of reasonable, less intrusive alternatives is relevant to a determination of practical necessity under the *Coleman* standard).

and that an immediate patdown of his person was "required ... as a matter of practical necessity." *Coleman*, 553 P.2d at 46 (quoting *Goss v. State*, 390 P.2d 220, 224 (Alaska 1964)).[8]

This case is REMANDED for reconsideration.

---

8. The superior court may, in its discretion, require or permit the parties to present additional evidence.