COMMONWEALTH *vs.* WING NG.

No. 93-P-1397.

Suffolk. April 20, 1994. - September 14, 1994.

Present: DREBEN, KAPLAN, & LAURENCE, JJ.

Further appellate review granted, 418 Mass. 1110 (1994).

*Constitutional Law,* Search and seizure. *Search and Seizure,* Threshold
police inquiry, Protective frisk.

At the time of police officers' arrest of a man, identified as a participant in
a recent robbery and armed assault in a dwelling, for whom the police
had a warrant, the officers, based on the potential dangerousness of the
circumstances, properly conducted a pat frisk of the driver of the car in
which the suspect was traveling: the driver's motion to suppress the
handgun seized from his waistband should have been denied. [286-289]

COMPLAINT received and sworn to in the Boston Municipal
Court Department on February 4, 1992.

A motion to suppress evidence was heard by *Paul L. Mc-
Gill,* J., sitting under statutory authority.

*John P. Zanini,* Assistant District Attorney, for the
Commonwealth.

*David Duncan (Norman S. Zalkind* with him) for the
defendant.

KAPLAN, J. A criminal complaint issued from the Boston
Municipal Court on February 4, 1992, charging the defend-
ant Wing Ng with unlawful possession of a handgun and am-
munition (G. L. c. 269, § 10[a] & [h]). The defendant's mo-
tion to suppress this contraband was allowed on February 22,
1993, after hearings in the jury session of the court. The
Commonwealth's application for interlocutory appeal from
the suppression order was allowed by a single justice of the
Supreme Judicial Court, the appeal to be heard by our court.

We describe the case, following the facts largely as found
by the judge of the Boston Municipal Court in his memoran-
dum of decision. In the morning of February 3, 1992, a con-

fidential informant telephoned James D. Goldman, special agent of the United States Immigration and Naturalization Service (INS), and told him that one John Wing had participated in a recent criminal armed invasion of a house in Randolph.[1] Goldman got in touch with the Randolph police department. It appeared that the crime occurred on January 26, 1992: three or four Asian men were involved; they had guns and stole a gun from the house; they dealt viciously with the victims, tied them up with duct tape and beat and kicked them.

At the request of the Randolph police and Goldman, the Asian gang task force of the Boston police worked up a photographic array that included a picture of John Ng. A victim, shown the array, identified John Ng's picture as that of one of the assailants. On the strength of the identification, the Randolph police in the afternoon of February 3 obtained a warrant for the arrest of John Ng.

In the early evening, the same informant called Goldman and told him that John Ng and others, including his brother Wing Ng, were traveling in a silver Subaru, Massachusetts registration plate 980PGP. Wing Ng was vaguely described. The informant said the party were then at a restaurant on Main Street, Cambridge. About 10:45 P.M., Goldman and another INS agent saw John Ng and other Asian men and women leave the Cambridge restaurant and depart in two cars.

The agents followed one of the cars (presumably the Subaru) and took up surveillance at the Gyuhama restaurant on Boylston Street, Boston. About 11:30 P.M., Randolph and Boston police officers, including Detective Waiman Lee of the Asian gang task force, converged at the location, joining Goldman. The group of officers were shown a photograph of John Ng and informed that he was the subject of an arrest warrant arising from the house crime. A Randolph plainclothes officer entered the restaurant and confirmed the pres-

---

[1]The judge properly held that the confidential informant qualified under the basis of knowledge and veracity tests, with corroboration by independent observations.

ence there of John Ng in the company of others. It was arranged, in the interests of safety, that the police approach should be withheld until John Ng and entourage had left the restaurant and entered a vehicle. Meanwhile an unmarked cruiser was put in position to block the parked Subaru.

One of the Boston officers who arrived to give assistance was James Hasson. Learning the circumstances, he was shown a photograph of John Ng (he said he had some ten seconds to view it). About 12:50 A.M., February 4, John Ng and his company left the restaurant. John Ng, three other males, and two women seated themselves in the Subaru.[2] The doors closed. Immediately the "go" police cue word was given and the officers moved to the car. With guns drawn or readily available, Hasson and Goldman (and perhaps others) went to the driver's side, while Detective Lee and Randolph officers went to the passenger's door area. The cue did not say where John Ng was seated within the car. In fact he was next to the driver on the front passenger seat.

Officer Hasson was concentrating on the driver; he might or might not be John Ng; in any case, Hasson intended to draw him out of the car. He did this. The man made no threatening moves or gestures. Goldman asked the man his name and place of birth. He said he was Wing Ng from Hong Kong. Hasson put him face down on the ground and pat frisked him.[3] Feeling a bulge, Hasson lifted Wing Ng's sweater and saw the grip of a semi-automatic handgun that was tucked in at the waist belt. Hasson removed the gun and, as Wing Ng admitted to not having a license, Hasson placed

---

[2]The judge counts John and two males but the record of the hearings supports the larger number.

[3]The other men were also placed on the ground.

him under arrest.[4] About twenty seconds had passed since Hasson reached the driver's door.[5]

1. In connection with accomplishing the arrest of John Ng, it was prudent and lawful for the police to remove the other occupants from the car and ask for identification. See *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977). Cf. *Commonwealth* v. *Moses*, 408 Mass. 136, 140 (1990). The judge properly acknowledged this. The question in the case is whether the facts furnished a basis for the police to go on and "pat frisk" the driver, Wing Ng.

2. It was early held (or at least strongly indicated) in *United States* v. *Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971), that an officer making an arrest was justified in stopping and frisking any companion of the arrestee in his immediate vicinity at the time (a "companion" being distinguished from a mere bystander[6]): the officer was not required at peril to himself and others to assess on the spot whether the companion was just a social acquaintance of the arrested person

---

[4]Goldman testified that he observed the gun on Wing Ng just before he was disposed on the ground but the judge did not accept this account. Even if accepted, it would not have altered the question of the legality of the frisk. See *United States* v. *Wheeler*, 800 F.2d 100, 105 n.2 (7th Cir. 1986).

Although the judge makes some comments on the matter, we do not enter upon a discussion of the rights of INS agents to inquire about compliance with immigration laws and to make or waive the making of arrests for violations. The arrest of John Ng and the frisking and arrest of Wing Ng were certainly not arranged to provide a pretext for any immigration sweep by Goldman.

[5]At several points in the record there was testimony that Hasson was informed that one of the men was armed. The judge indeed stated in his memorandum that "Officer Hasson was . . . informed that someone in the group of Asian males was armed," but in a later footnote he expressed disbelief. In a colloquy he also declined the Commonwealth's request that he find, in accordance with the Commonwealth's view of the testimony, that the confidential informant provided information that someone in the group was armed. With some doubts, we follow the judge on the matter. This does not disturb our over-all conclusion that the frisk of the defendant was a sensible precaution in the circumstances.

[6]Cf. *Ybarra* v. *Illinois*, 444 U.S. 85, 94-95 (1979) (search under warrant for named person and premises; no basis for frisk or search of one merely present at the scene). See also *United States* v. *Flett*, 806 F.2d 823, 826-827 (8th Cir. 1986).

or perhaps a gun-carrying crony. This *Berryhill* proposition would have the advantage of setting a bright line or rule of thumb for the conduct of the police, and the saving of life or limb otherwise sacrificed to poor guesswork might be thought to offset the damage to the personal integrity of those who, although quite innocent, might be subjected to a momentary frisk. The "automatic" companion rule, however, did not comport with the idea of *Terry* v. *Ohio*, 392 U.S. 1 (1968), namely, that to defend his carrying out a frisk an officer must be able to point to specific, articulable facts with any plausible inferences therefrom giving rise in his mind to a reasonable suspicion that the particular individual might be armed and a potential threat to the safety of the officer or others. For the retreat from *Berryhill*, see *United States* v. *Bell*, 762 F.2d 495, 498-499 (6th Cir. 1985); *United States* v. *Flett*, 806 F.2d 823, 826-829 (8th Cir. 1986); *Eldridge* v. *Alaska*, 848 P.2d 834, 837-838 (Alaska App. 1993).[7] Later decisions have begun to sketch in the something additional, beyond the *Berryhill* factors themselves, that is needed under the *Terry* doctrine to support an officer's self-protective frisk of the companion in a situation of arrest for serious crime.

3. So we look to what the police might have thought about Wing Ng as he was taken from the car at the time of the arrest of John Ng. That he was a companion of John (in fact a close kinsman) and was near him in the confined space of the automobile at the moment of the arrest would not be enough to base a pat frisk if *Berryhill* is abandoned, but these facts remain influential and measurably support the police action. See *United States* v. *Bell*, 762 F.2d at 500; *United States* v. *Flett*, 806 F.2d at 827. Further, Wing was one of an evidently cohesive group that moved with John from place to place and into the car. Cf. *United States* v. *Wheeler*, 800 F.2d 100, 103-104 (7th Cir. 1986). The nature and manner of execution of the crime for which the principal is arrested has been rightly thought important as an indica-

---

[7]*Maryland* v. *Buie*, 494 U.S. 325 (1990) (validity of a "protective sweep" of premises after lawful arrest therein), suggests that a strict *Berryhill* position would be of dubious constitutionality.

tor of the degree of suspicion that may reasonably arise regarding the companion, see 3 LaFave, Search and Seizure § 9.4(a), at 511 n.73 (2d ed. 1987), and here the crime charged to John was heinous and committed not by John alone but a coterie, and — most indicative — involved the use and theft of guns. See *United States* v. *Simmons*, 567 F.2d 314, 319-320 (7th Cir. 1977). One who like John Ng was abroad after doing such deeds might think it convenient or necessary for his self-protection that he have a gun in the hands of a close bodyguard. See *United States* v. *Del Toro*, 464 F.2d 520, 521 (2d Cir. 1972). We note, too, that the encounter with Wing was under street lights past midnight and the place was Boylston Street where danger to automobile and pedestrian traffic had still to be considered. See 3 LaFave, supra § 9.4(a), at 511 n.74.

It is true that nothing of record linked Wing Ng as an actor in the house invasion. True, too, that a sizeable police force was present at the scene of the arrest.[8] This might discourage an assault by a person in Wing's position even if he had a gun; on the other hand, the fact that numerous police were present has not proved in the past to be a sure inhibitor of such an assault intended however recklessly to effect escape or to rescue an associate. Cf. *United States* v. *Del Toro*, 464 F.2d at 521; *United States* v. *Poms*, 484 F.2d 919, 921 (4th Cir. 1973).

4. The judge below thought the law demanded that the police let Wing Ng go as soon as he identified himself because, according to the judge, the police, at this critical time for decision whether to release Wing or to hold him provisionally, had only evidence that "(1) Wing Ng was the brother of John Ng; (2) Wing Ng was in the company of his brother a week after his brother was involved in a crime; and (3) Wing Ng had been under surveillance while at two separate restaurants just prior to getting into a motor vehicle

---

[8]The judge said at least two INS agents, two Randolph officers, and eight to ten Boston officers were at the scene.

with his brother."[9] We suggest that this reductionist statement pays no attention to the inferences open to experienced police officers from the facts known to them, as suggested above, and skimps the strength of the total picture as the police could see it.[10] That the evidence must be particularized to the individual may be satisfied by an accumulative process. We add that a reading of the judge's memorandum suggests to us that he may have been demanding probable cause as for an arrest, or something close to it, rather than just the grounded suspicion of danger we require to support a frisk. "Potential" dangerousness is the key. *United States* v. *Flett*, 806 F.2d at 828.

> *Order allowing motion for suppression reversed.*

---

[9]*Commonwealth* v. *Loughlin*, 385 Mass. 60, 62 (1982), cited by the judge, is indeed a case where there was no basis for apprehending danger after the identification stage. The present case differs.

[10]The judge did not deal with the decisions in the Federal circuits where the subject has been most explored.